[Cite as *Harrison v. Bishop*, 2015-Ohio-5308.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Langston Harrison, Jr. et al.                    Court of Appeals No. L-14-1137

      Appellants                                Trial Court No. CI0201205084

v.

Raymond G. Bishop, Jr., et al.                   **<u>DECISION AND JUDGMENT</u>**

      Appellees                                 Decided:  December 18, 2015

* * * * *

David A. Bryan and Nathan H. Zechman, for appellants.

Stuart J. Goldberg, Jeffrey M. Stopar and Neema M. Bell, for appellees.

* * * * *

**YARBROUGH, P.J.**

## I.  Introduction

**{¶ 1}** Appellants, Langston Harrison, Jr., James Martin, John Rambus, and Eddie Ransom, appeal the judgment of the Lucas County Court of Common Pleas, granting appellees' motion to dismiss for lack of subject matter jurisdiction under Civ.R. 12(B)(1).

## A. Facts and Procedural Background

**{¶ 2}** On August 30, 2012, appellants, in their individual capacities and as members of Mt. Pilgrim Baptist Church, Inc., a nonprofit corporate congregational church, filed a complaint against appellees, Raymond Bishop, Jr., Kevin Gregory, Sr., Debrah Harleston, Gloria Mathis, LeRoyna Drayton, Patricia Ellis, DeLise Simmons, Tracy Brown, and Suzette Cowell, in their capacities as directors and former directors of the church. Bishop is also the Senior Pastor of the church.

**{¶ 3}** According to the complaint, the dispute giving rise to this case began on July 20, 2011, when appellees took de facto control of the Mt. Pilgrim Baptist Church and its assets. Prior to appellees' alleged takeover of the church, the church's Board of Deacons passed a resolution seeking Bishop's dismissal for misappropriation of church property. However, Bishop refused to step down as senior pastor of the church.

**{¶ 4}** Subsequently, the church held its annual meeting on December 14, 2011. On that date, the church adopted the "Constitution of Mt. Pilgrim Baptist Church, Inc.," a copy of which was attached to appellants' complaint. The Constitution, which is also the code of regulations of Mt. Pilgrim Baptist Church, Inc., contains numerous references to biblical passages and doctrinal material.

**{¶ 5}** Since the church's adoption of its Constitution, appellees have allegedly "failed to report to the members of the Church any information concerning the manner in which they have administered the affairs of the Church and have failed to account to the members for the funds they have received or how they have utilized the Church's assets."

2.

Specifically, appellants' alleged that appellees, as leaders of the church and officers of the corporation, failed to present a financial report or budget to the congregation at the December 14, 2011 annual meeting. Further, appellants allege that Bishop (the senior pastor) transferred church funds to an undisclosed location. Appellants are particularly concerned about Bishop's activities in light of a prior instance in which he allegedly misappropriated a church vehicle for his personal use without the approval of church leadership.

{¶ 6} In addition to their contention that appellees have mismanaged the church's finances, appellants also alleged that appellees prevented them from examining the church's books, accounts, and records in violation of R.C. 1702.15. According to the complaint, appellants formally requested certain financial information from appellees on July 13, 2012. Appellees have not provided the requested information.

{¶ 7} The purpose for appellants' request was stated in their complaint as follows:

> Plaintiffs' purpose in asking for the Requested Financial Documentation is so they could determine the general financial position of the Church and the manner in which the Defendant Officers and Defendants were administering their offices and performing their duties to preserve Church assets and its unrestricted and restricted funds for the purposes intended by the members of the Church and the donors of same.

{¶ 8} As a result of the foregoing, appellants filed their complaint, asserting claims for breach of fiduciary duty and breach of contractual and statutory duties regarding the

3.

administration of the church under its constitution. More specifically, appellants alleged that appellees breached their duties under the church's constitution by mismanaging the church's funds, failing to comply with various reporting requirements under the church's constitution, withholding quarterly financial statements from members, and failing to disclose certain financial records upon request. Moreover, appellants alleged that appellees breached their duties under R.C. 1702.15 by refusing to allow appellants to examine the church's books and records. Additionally, appellants sought a declaratory judgment that certain provisions of the church's constitution, involving the church's handling of charitable contributions and members' access to civil courts for the resolution of church disputes, are in violation of federal and/or Ohio law. In particular, appellants alleged that Sections 14.01 and 12.01 of the church constitution are unlawful and unenforceable. Section 14.01 sets forth a process for resolving disputes in a "biblical manner." Relevant here, Section 14.01 provides:

> By joining or retaining membership in this Church, all members, directors, officers and employees agree that these methods shall provide the sole remedy for any dispute arising against or within this Church, and they waive their right to file any legal action against the Church or its directors or officers. (1 Corinthians 6:1-8)

{¶ 9} Section 12.01 of the church's Constitution provides:

> From time to time, the Church, in the exercise of its religious, educational, and charitable purposes, may establish various funds to

4.

accomplish specific goals. Contributors may suggest uses for their contributions, but all suggestions shall be deemed advisory rather than mandatory in nature. All contributions made to specific funds, or otherwise designated, shall remain subject to the exclusive control and discretion of the Board of Ministry Directors and the Stewardship Committee. No fiduciary obligation shall be created by any designated contribution made to the Church other than to use the contribution for the general furtherance of any purposes stated in Section 2.02.

{¶ 10} In addition to seeking declaratory relief regarding the enforceability of Section 12.01, appellants also petitioned the court to impose a constructive trust on all funds solicited by the church for which a purpose was designated by the donor. Finally, appellants requested an accounting of the church's financial records, including the donations received by the church, financial statements and tax returns, and a copy of the church's "financial prosperity plan."

{¶ 11} Two months after the filing of the complaint, appellees filed a "joint motion to dismiss plaintiffs' complaint" under Civ.R. 12(B)(1) and (6). In their motion, appellees asserted that appellants' complaint raises ecclesiastical issues over which the trial court lacked subject matter jurisdiction under the First and Fourteenth Amendments to the United States Constitution. Alternatively, appellees asserted that appellants, by virtue of their membership in the church and their corresponding assent to the terms of the church's constitution, waived their rights to bring this action by agreeing to "resolve

5.

any and all intra-Church conflict * * * internally through an agreed upon procedure governed by biblical principles."

{¶ 12} On November 30, 2012, appellants filed their memorandum in opposition to appellees' motion to dismiss, in which they argued that the court has subject matter jurisdiction over this case, as it involves secular issues regarding the enforcement of the provisions set forth in the church's constitution, which is also the code of regulations for Mt. Pilgrim Baptist Church, Inc.

{¶ 13} Before the trial court issued its decision on appellees' motion to dismiss, appellants filed a motion for leave to amend the complaint in order to add an additional claim for breach of fiduciary duty against appellees as officers of the church and members of the church's Board of Ministry Directors.

{¶ 14} Ultimately, on May 30, 2014, the trial court issued its decision on appellees' motion to dismiss and appellants' motion for leave to amend the complaint. In a 95-page opinion, the trial court granted appellees' motion to dismiss and denied appellants' motion for leave to amend the complaint, reasoning that the claims contained in the complaint (including the additional claim proposed in the amended complaint) were ecclesiastical in nature and were, therefore, beyond the subject-matter jurisdiction of the court under the ecclesiastical abstention doctrine. Appellants' timely appeal followed.

### B. Assignments of Error

{¶ 15} On appeal, appellants raise the following assignments of error:

6.

I.  The trial court committed reversible error in granting defendants-appellees' Motion to Dismiss and denying plaintiffs-appellants' Motion to File an Amended Complaint because the court below has subject matter jurisdiction to enforce secular rules and standards of conduct that the defendants-appellees imposed upon themselves.

II.  The trial court committed reversible error by finding that the Constitution of Mt. Pilgrim Baptist Church purported to be followed by defendants-appellees contains an internal dispute resolution mechanism that is applicable to the claims in plaintiffs-appellants' complaint or proposed amended complaint.

III.  The trial court committed reversible error by finding that the Constitution of Mt. Pilgrim Baptist Church purported to be followed by defendants-appellees contains an internal dispute resolution mechanism that provides plaintiffs-appellants an adequate remedy; i.e., a remedy that is not futile.

IV.  The trial court committed reversible error by granting defendants-appellees' Motion to Dismiss under Ohio Civil Rule 12(B)(1) and denying plaintiffs-appellants' Motion to Amend their Complaint to add Additional Claims.

{¶ 16} Because all of appellants' assignments of error challenge the trial court's dismissal of this case under Civ.R. 12(B)(1), we will address them simultaneously.

7.

## II.  Analysis

{¶ 17} In appellants' brief, they argue that the trial court erred in granting appellees' motion to dismiss under Civ.R. 12(B)(1) upon a determination that this case involves an ecclesiastical dispute over which the court had no subject matter jurisdiction.

{¶ 18} A Civ.R. 12(B)(1) motion allows a trial court to dismiss a complaint when the trial court lacks subject matter jurisdiction at the time the complaint was filed.  The issue under Civ.R. 12(B)(1) is "whether any cause of action cognizable by the forum has been raised in the complaint."  *State ex rel. Bush v. Spurlock*, 42 Ohio St.3d 77, 80, 537 N.E.2d 641 (1989), citing *Avco Fin. Servs. Loan, Inc. v. Hale*, 36 Ohio App.3d, 65, 67, 520 N.E.2d 1278 (10th Dist.1987).  Appellate courts review a decision to dismiss under Civ.R. 12(B)(1) de novo, employing the same standard as the trial court.  *Howard v. Supreme Court of Ohio*, 10th Dist. Franklin Nos. 04AP-1093, 04AP-1272, 2005-Ohio-2130, ¶ 6, citing *Kramer v. Installations Unlimited, Inc.*, 147 Ohio App.3d 350, 352, 170 N.E.2d 632 (5th Dist.2002).

{¶ 19} "It is well established that civil courts lack jurisdiction to hear or determine purely ecclesiastical or spiritual disputes of a church or religious organization."  (Citations omitted.)  *Tibbs v. Kendrick*, 93 Ohio App.3d 35, 41, 637 N.E.2d 397 (8th Dist.1994).  This is known as the ecclesiastical abstention doctrine.  In order to fully understand the parameters of this constitutional doctrine, we will begin our analysis with a review of the relevant United States Supreme Court ("the Court") case law.

8.

{¶ 20} The Court first addressed the issue of civil court involvement in the affairs of religious organizations in the seminal case of *Watson v. Jones*, 80 U.S. 679, 20 L.Ed. 666 (1871). In that case, civil courts were asked to resolve a property dispute that stemmed from a controversy over church doctrine between a national hierarchical Presbyterian organization and local churches of that organization. Specifically, the plaintiffs in *Watson* sought a judgment terminating an implied trust over church property based upon the national organization's alleged departure from traditional church doctrine. In declining to entertain the suit, the Court found that the determination of ecclesiastical questions by civil courts was inconsistent with the American concept of the relationship between church and state, thereby creating what is referred to as the "ecclesiastical abstention doctrine." Although not decided on constitutional grounds, subsequent United States Supreme Court decisions have found that the following language from *Watson* is rooted in the Constitution:

> In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for

9.

the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for. *Id*. at 728.

{¶ 21} The Court revisited the ecclesiastical abstention doctrine in 1929 in *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929), a case in which the petitioner, Raul Rogerio Gonzalez, sought a judgment declaring that he was the lawful heir to a collative chaplaincy in the Roman Catholic Archdiocese of Manila. Gonzalez asserted that he was entitled to be appointed chaplain under a will that provided that a member of his family receive that appointment. *Id*. at 6. However, the Archdiocese of Manila refused to appoint him chaplain because of his failure to meet certain age and knowledge requirements under the applicable canon law. *Id*. Gonzales was only ten years of age when he was presented for appointment. While Gonzalez conceded that he did not possess the necessary qualifications under church

canon law, he argued that past practice of the church demonstrated that the ecclesiastical character of the chaplain was a minor consideration. *Id*. at 7. Moreover, Gonzalez asserted that his ecclesiastical qualifications were at least on par with those of prior chaplains. *Id*.

{¶ 22} The trial court entered judgment for Gonzalez, but the Supreme Court of the Philippine Islands reversed and absolved the Archbishop from the complaint. In affirming the judgment of the Supreme Court of the Philippine Islands, the United States Supreme Court defined the role of civil courts in matters involving ecclesiastical issues as follows:

> In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise. Under like circumstances, effect is given in the courts to the determinations of the judicatory bodies established by clubs and civil associations. *Id*. at 7-8.

{¶ 23} As in *Watson*, the Court did not explicitly rely upon the Constitution in support of its determination of the role of civil courts in ecclesiastical matters. That changed, however, in the case of *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N.A.*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952).

11.

{¶ 24} *Kedroff*, a church property case, stemmed from a dispute between the hierarchical Russian Orthodox Church based in Moscow (the general church) and the Russian Orthodox Church in North America (the North American church) over the right to use and occupy St. Nicholas Cathedral in New York City. The North American church had previously declared its independence from the general church. Subsequently, the New York legislature enacted a statute, Article 5-C of the Religious Corporations Law of New York, the purpose of which was to "bring all the New York churches, formerly subject to the administrative jurisdiction of the [general church], into an administratively autonomous metropolitan district." *Id.* at 98. The general church brought suit, seeking a determination that the New York statute was invalid under the Free Exercise Clause of the First Amendment, as made applicable to the states through the Fourteenth Amendment. *Id.* at 100.

{¶ 25} The New York state courts sustained the constitutionality of the statute, and concluded that the North American church had the right to use the cathedral. Eventually, the case made its way to the United States Supreme Court, where it was determined that the New York law violated the Fourteenth Amendment in its attempt to transfer control of the New York Russian Orthodox churches from the general church to the North American church. *Id*. at 107. In so concluding, the Court stated:

> The opinion [in *Watson, supra*] radiates * * * a spirit of freedom for
> religious organizations, an independence from secular control or
> manipulation, in short, power to decide for themselves, free from state

12.

interference, matters of church government as well as those of faith and doctrine. Freedom to select the clergy, where no improper methods of choice are proven, we think, must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference. *Id.* at 116.

{¶ 26} Turning to the constitutionality of the New York statute, the Court stated:

In upholding the validity of Article 5-C, the New York Court of Appeals apparently assumes Article 5-C does nothing more than permit the trustees of the Cathedral to use it for services consistent with the desires of the members of the [North American church]. Its reach goes far beyond that point. By fiat it displaces one church administrator with another. It passes the control of matters strictly ecclesiastical from one church authority to another. It thus intrudes for the benefit of one segment of a church the power of the state into the forbidden area of religious freedom contrary to the principles of the First Amendment. *Id.* at 119.

{¶ 27} Eight years after releasing its decision in *Kedroff*, the Court issued *Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960), in which it dismissed an action concerning the use and occupancy of St. Nicholas Cathedral that was filed under a common law issue left unresolved in *Kedroff*. In dismissing the complaint, the Court explained that the constitutional concerns present in *Kedroff*

13.

regarding the New York statute are also applicable when the state acts solely through the judicial branch. *Id.* at 191.

{¶ 28} The Court subsequently addressed the ecclesiastical abstention doctrine in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem. Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), a case in which the Court examined whether a civil court could constitutionally award church property on the basis of its interpretation of certain aspects of church doctrine and the significance it assigns to that doctrine. *Id*. at 441.

{¶ 29} In *Blue Hull*, a dispute arose between the Presbyterian Church in the United States (the general church), a hierarchical association of local Presbyterian churches, and two local Presbyterian churches in Savannah, Georgia. The dispute arose following a vote from the local churches to withdraw from the general church based upon the belief that the general church had departed from traditional church doctrine. *Id.* at 442. As a result of the withdrawal of the local churches from the general church, the general church attempted to take over the local churches' property until new leadership could be appointed. *Id*. at 443. In response, the local churches filed suit, seeking to enjoin the general church from trespassing on the disputed property. Under Georgia law at that time, a trust of the disputed property was implied for the benefit of the general church on the condition that the general church abide by its tenets of faith and practice that existed at the time of affiliation by the local churches. *Id.* The local churches argued that the general church was not entitled to the benefits of the implied trust because it had departed

14.

from church doctrine that was in place at the time of their affiliation with the general church.

{¶ 30} The general church filed a motion to dismiss the action, arguing that "civil courts were without power to determine whether the general church had departed from its tenets of faith and practice." *Id.* The trial court denied the general church's motion to dismiss. Eventually, a jury trial ensued, and the case was submitted to the jury with instructions to "determine whether the actions of the general church 'amount to a fundamental or substantial abandonment of the original tenets and doctrines of the (general church), so that the new tenets and doctrines are utterly variant from the purposes for which the (general church) was founded.'" *Id.* at 443-44. The jury found in favor of the local churches, and the trial judge granted the local churches' request for injunctive relief, preventing the general church from interfering with their use of the disputed property. The Supreme Court of Georgia affirmed.

{¶ 31} On appeal to the United States Supreme Court, the Court began its analysis by examining its prior decisions in *Watson*, *Gonzalez*, *Kedroff*, and *Kreshik*. In summing up its prior holdings in those cases, the Court stated:

Thus, the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by

opening their doors to disputes involving church property.  And there are *neutral principles of law*, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded.  But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice.  If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern.  Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes, *School District of Township of Abington, Pa. v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine.  Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.  (Emphasis added.)  *Id*. at 449.

{¶ 32} Ultimately, the Court found that the Georgia law at issue impermissibly required the courts to interpret and assign importance to church doctrine in violation of

the First Amendment.  *Id.* at 450.  Consequently, the Court reversed the decision of the Supreme Court of Georgia.

{¶ 33} Seven years later, the Court released its decision in *Serbian Eastern Orthodox Diocese for the United States of Am. and Canada v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), involving a dispute over the control of the property and assets of the Serbian Eastern Orthodox Diocese for the United States of America and Canada, a hierarchical religious corporation formed under Illinois law (the corporation).

{¶ 34} In *Milivojevich*, the corporation, along with Dionisije Milivojevich, a recently defrocked bishop of the Serbian Eastern Orthodox Diocese for the United States of America and Canada (the Diocese), and the Serbian Orthodox Monastery of St. Sava, brought suit against the Mother Church and three of its bishops who were appointed to replace Milivojevich, seeking to enjoin the defendants from interfering with the assets of the corporation and to have Milivojevich declared the true bishop of the Diocese.  *Id.* at 706-07.  The defendants replied via a separate complaint seeking declaratory relief that Milivojevich had been properly removed as bishop of the Diocese, and requesting control of the Diocese.  *Id.* at 707.  Following trial, the trial court found, inter alia, that the Diocese lawfully removed Milivojevich as bishop.  However, the trial court's judgment was reversed by the Illinois Supreme Court, which determined that Milivojevich's removal had to be set aside as arbitrary because "the proceedings resulting in those

17.

actions were not conducted according to the Illinois Supreme Court's interpretation of the Church's constitution and penal code." *Id.* at 708.

{¶ 35} On appeal to the United States Supreme Court, the Court took issue with the Illinois Supreme Court's conclusion that the Diocese arbitrarily defrocked Milivojevich in violation of certain provisions of its constitution. *Id.* at 719. Specifically, the court stated:

> In short, under the guise of "minimal" review under the umbrella of "arbitrariness," the Illinois Supreme Court has unconstitutionally undertaken the resolution of quintessentially religious controversies whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals of this hierarchical church. *Id.* at 720.

{¶ 36} Further, the Court refused to review the relevant provisions of the Diocese's constitution, finding that doing so would repeat the error of the Illinois Supreme Court because the constitution was "not so express that the civil court could enforce [it] without engaging in a searching and therefore impermissible inquiry into church polity." *Id.* at 723.

{¶ 37} Notwithstanding the Court's refusal to consider the Diocese's constitution in *Milivojevich*, the court approved of such consideration in *Jones v. Wolf*, 443 U.S. 595, 604, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). There, the trial court, applying "neutral principles of law," set out to determine whether church property located in Macon, Georgia, was owned by the Vineville Presbyterian Church of Macon, Ga. (local church)

18.

or the Augusta-Macon Presbytery of the Presbyterian Church in the United States, a hierarchical church organization with which the local church was formerly associated. In so doing, the trial court granted judgment in favor of the local church. On appeal to the United States Supreme Court, the Court concluded that the "neutral principles of law" approach, which "requires a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church," passed constitutional muster. *Id.* at 604. However, the Court cautioned trial courts to "take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust." *Id.*

{¶ 38} In addition to the foregoing decisions of the United States Supreme Court, the Supreme Court of Ohio also addressed the ecclesiastical abstention doctrine in *Serbian Orthodox Church Congregation of St. Demetrius of Akron v. Kelemen*, 21 Ohio St.2d 154, 256 N.E.2d 212 (1970). In that case, a hierarchical unincorporated church holding itself out as the Serbian Orthodox Church Congregation of St. Demetrius of Akron (the mother church) filed a complaint against several individuals who claimed to be parishioners of the Serbian Orthodox Church of St. Demetrius of Akron, Ohio, a not-for-profit corporation (the local church). In the complaint, the mother church sought to enjoin the parishioners from using the name "St. Demetrius," or "St. Demetrius Church," or "St. Demetrius Church Parishioners." *Id.* at 154-55. The parishioners counterclaimed, asking the trial court to determine that the mother church was unlawfully preventing them

19.

from using the church property, seeking an injunction preventing the mother church from representing itself to be the Serbian Orthodox Church Congregation of St. Demetrius of Akron, Ohio, and requesting that the control of the church's assets be transferred to a temporary "Caretaker Board." *Id.* at 155.

{¶ 39} The trial court ruled in favor of the parishioners and ordered the mother church to relinquish management of church property and vacate positions of trust in the church organization. The matter proceeded through the appellate process, making its way to the United States Supreme Court. In a per curiam decision, the United States Supreme Court granted certiorari, vacated the trial court's judgment, and remanded the matter to the Supreme Court of Ohio for further consideration in light of its decision in *Blue Hull, supra*. *Serbian Orthodox Church Congregation of St. Demetrius of Akron v. Kelemen*, 393 U.S. 527, 89 S.Ct. 849, 21 L.Ed.2d 750 (1969).

{¶ 40} On remand, the Supreme Court of Ohio cited *Blue Hull* for the proposition that the determination of the right to possession and control of church property is to be restricted to the utilization of "neutral law principles." *Kelemen, supra*, 21 Ohio St.2d at 157, 256 N.E.2d 212 (1970). The court went on to hold that the control of the name and property of the church "must be determined only by reference to the provisions of the Code of Regulations and By-Laws of the corporation not for profit, the corporate laws of this state, and any other secular instruments not requiring the resolution of religious tenets and doctrine." *Id.* at 162. By reference to these documents, the court found that

title to the church property was vested in the local church corporation, not the mother church.

**{¶ 41}** In the years since the foregoing decisions were released, Ohio appellate courts have fashioned the ecclesiastical abstention doctrine into a two-part test to determine whether a court has subject matter jurisdiction over a church dispute. In the first step, courts must determine whether the organization is hierarchical or congregational. *Bhatti v. Singh*, 148 Ohio App.3d 386, 2002-Ohio-3348, 773 N.E.2d 605, ¶ 25 (2d Dist.). "A hierarchical polity exists when 'the religious congregation * * * is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization.'" *State ex rel. Morrow v. Hill*, 51 Ohio St.2d 74, 76, 364 N.E.2d 1156 (1977), quoting *Watson, supra*, 80 U.S. 679, 722-23, 20 L.Ed. 666 (1871). By contrast, a congregational polity exists where a religious congregation "is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority." *Watson* at 722. If the organization is congregational, then the court determines whether the dispute is ecclesiastical or secular in nature. *Tibbs v. Kendrick*, 93 Ohio App.3d 35, 43, 637 N.E.2d 397 (8th Dist.1994). The court maintains jurisdiction over secular issues. *Id.* at 42.

**{¶ 42}** Here, the parties agree that Mt. Pilgrim Baptist Church is a congregational religious organization. Consequently, we must determine whether the dispute in this case

21.

is ecclesiastical or secular in nature. In order to do so, we look to the allegations contained in appellants' complaint.

{¶ 43} In their complaint, appellants allege that appellees breached their duties to disclose financial information of the church. Appellants also allege that appellees breached certain fiduciary duties imposed by the Constitution in failing to properly manage the church's resources, failing to report financial transactions to the congregation, and failing to provide financial documentation upon request by the congregation. Appellants cite select provisions in the Constitution that they allege give rise to appellees' duties. While most of these provisions contain secular language akin to that found in typical corporate governance documents, much of the church's constitution contains doctrinal statements and references to biblical passages. Tellingly, the introduction to the Constitution provides:

Section 1.01 – Introduction

Foremost in the operation of this Church is the Word of God as taught in the Old and New Testaments of the Holy Bible. *All provisions herein are declared to be subjected to the Word of God, as found in the King James Version or other translations of the Holy Bible generally accepted among Bible-believing congregations.* (Emphasis added.)

{¶ 44} Further, section 7.01, one of the sections upon which appellants rely in supporting their allegation that appellees have breached their duties to disclose financial information, includes multiple references to biblical passages, as follows:

22.

Section 7.01 – Senior Pastor

(A)  The term "Senior Pastor" herein refers to the President and Chief Executive Officer and spiritual leader of this Church.

(B)  The Senior Pastor is ex officio (by virtue of his position) overseer of all ministries.

(C)  The Senior Pastor shall work in consultation with the Board of Ministry Directors on legal and business matters of the Church.  The Pastor's duties and responsibilities shall include (but not be limited to) the following:

1.  Oversee the spiritual and temporal affairs of the Church (1 Peter 5);

2.  Teach the Word of God with knowledge and understanding (Luke 4; Jeremiah 3:15);

3.  Provide the vision and missional direction of the Church (Habakkuk 2:1-3);

4.  Preach and Proclaim the Word of God (Matthew 28);

5.  Equip believers for the work of the ministry and mature in the Faith (Ephesians 4);

6.  Lead in the spiritual formation of the congregational body (Matthew 28);

23.

7.  Select and supervise the Church staff in accordance with the Word of God, law and operational procedures of the Church;

8.  Perform such other responsibilities of the Senior Pastor as may be set forth in any Pastoral Covenant/Contract;

9.  Select all ministers, preachers, speakers and guest performers and determine honorariums for the same.

10.  Call and act as moderator at all Church business meetings with the exception as outlined in Section 14.02.

**{¶ 45}** Having reviewed the allegations contained in the complaint, and having fully examined the church's Constitution, we find that the issues raised in appellants' complaint are ecclesiastical in nature. Here, appellants contend that the issues raised in the complaint require the trial court to merely enforce the obligations contained in secular portions of the church's Constitution. A court may decide a church dispute if its decision is "based strictly upon a neutral and secular reading of the church's own constitution." *Winston v. Second Baptist Missionary Church of Lorain*, 9th Dist. Lorain No. 96CA006588, 1997 WL 576374, *2 (Sept. 10, 1997), citing *Wolf*, *supra*, 443 U.S. at 604, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979).

**{¶ 46}** However, as noted above, much of the Constitution contains doctrinal material and scriptural references. Indeed, the document even contains the church's statement of faith. Notably, the Constitution also instructs that all provisions within it are

24.

to be "subjected to the Word of God, as found in the King James Version or other translations of the Holy Bible generally accepted among Bible-believing congregations."

{¶ 47} While it is true that the Constitution contains apparently secular provisions, we cannot view those provisions in isolation, thereby ignoring the ecclesiastical content that is found throughout the document. In view of the patently religious nature of the church's Constitution, we find that reliance upon provisions within the Constitution for determination of the rights and responsibilities of the parties in this case, under auspices of "neutral principles of law," would necessarily entangle the trial court in ecclesiastical issues over which the court has no subject matter jurisdiction under the First and Fourteenth Amendments to the United States Constitution. As noted above in our discussion of controlling precedent, the United States Supreme Court has cautioned religious organizations who wish to provide for civil court assistance in the resolution of church disputes to "structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." *Blue Hull, supra*, 393 U.S. at 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). The church in this case has failed to heed this advice.

{¶ 48} Further, we find that appellants, in filing this action, are essentially seeking to utilize the power of the civil courts to institute the termination and replacement of the church's leadership. In *Tibbs, supra*, the court stated that "[g]enerally, the question of who will preach from the pulpit of a church is an ecclesiastical question, review of which by the civil courts is limited by the First and Fourteenth Amendments to the United States Constitution." *Tibbs*, 93 Ohio App.3d at 41, 637 N.E.2d 397 (8th Dist.1994), citing

*Kedroff, supra,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952). Citing *Tibbs*, the Second District found that a trial court lacked subject matter jurisdiction over an action alleging breach of fiduciary duty and seeking an accounting of a church's financial records, accounts, and transactions. *Robinson v. Freedom Faith Missionary Baptist Church*, 2d Dist. Montgomery No. 20232, 2004-Ohio-2607, ¶ 29. There, the court concluded that an inquiry into such matters "would necessarily involve whether the pastor of the Church engaged in wrongdoing, and therefore, whether he should be removed as pastor." *Id.*; *see also Jones v. Wilson*, 8th Dist. Cuyahoga No. 88890, 2007-Ohio-6484, ¶ 26 (concluding that the trial court properly refrained from resolving a dispute as to whether a church followed a 150-person quorum rule set forth in its constitution because resolution of the dispute would "inextricably require an examination of internal church discipline, which is governed by ecclesiastical rule, custom, and law").

**{¶ 49}** A similar result was reached in *Smith v. White*, 7 N.E.3d 552, 2014-Ohio-130 (2d Dist.). In that case, a 36-person coalition of plaintiffs (hereinafter collectively referred to as "Smith"), consisting of members, trustees, and deacons of the Mt. Carmel Missionary Baptist Church, a congregational church, brought suit against the church's pastor, Chad White, 9 of its members, and the church itself, alleging breach of fiduciary duty, conversion, civil conspiracy, unjust enrichment, fraud, and breach of contract, and also seeking an accounting.

**{¶ 50}** After hiring White in 2003, members of the Mt. Carmel congregation learned that certain aspects of White's resume were not truthful. *Id.* at ¶ 11. Further,

26.

members began to suspect financial misconduct on the part of White and other defendants. Consequently, the property used to house pastors was sold and the proceeds were hidden "because the pastor was spending so much money." *Id.* By 2009, White was bypassing the normal financial decision-making process in the church, which involved congregational approval of all expenditures exceeding $4,000. Instead, financial decisions were made by a small group of people. *Id.* at ¶ 12. After this time, several issues arose concerning White's management of church funds. For example, the church raised approximately $10,000 for a Haitian relief fund, to be personally delivered to Haiti by White. Although White claimed to have delivered the money, no evidence of the delivery was ever produced. In addition, White allegedly expended church funds for his personal use without congregational approval. Moreover, White, along with two other defendants, removed $45,000 from the pastoral retirement annuity account for their own benefit without notifying the deacons and trustees of the church. *Id.* at ¶ 13. Ultimately, the church's controller of finance resigned from the position, and removed the hard drive from the church's computer.

{¶ 51} As a result of the foregoing, Smith filed suit on February 2011. The defendants eventually filed a motion to dismiss the complaint under Civ.R. 12(B)(1) for lack of subject-matter jurisdiction, which the trial court granted on the basis that "it was prohibited from inquiring into areas of church government, and that Smith had failed to exhaust internal procedures." *Id.* at ¶ 20.

27.

**{¶ 52}** On appeal, Smith argued that the case should not have been dismissed under the ecclesiastical abstention doctrine, because it did not involve ecclesiastical matters. *Id.* at ¶ 22. The Second District, in affirming the trial court's dismissal of the action under Civ.R. 12(B)(1), expressed some concern over whether a request for an accounting of finances necessarily implicates the ecclesiastical abstention doctrine, but noted that "[m]atters of ecclesiastical abstention are often not clear-cut." Ultimately, the court found that the record indicated Smith's desire to remove White from the pastorate, an issue that was ecclesiastical in nature. *Id*. at ¶ 48.

**{¶ 53}** Similarly here, we find that resolution of the issues contained in appellants' complaint would involve a determination of wrongdoing on the part of church leadership, and, by extension, whether appellees should be removed from their positions. Our conclusion is supported by the fact that appellants have filed another complaint in a case that remains pending before this court, in which they seek, inter alia, the trial court's declaration that Bishop was properly terminated from his position as senior pastor of the church. *Mt. Pilgrim Baptist Church, Inc. v. Bishop*, 6th Dist. Lucas No. L-14-1206.

**{¶ 54}** In light of the foregoing, we find that the resolution of the secular issues in this case would necessarily involve the review of ecclesiastical matters over which the trial court has no subject matter jurisdiction under the ecclesiastical abstention doctrine. Thus, we conclude that the trial court properly granted appellees' motion to dismiss under Civ.R. 12(B)(1).

**{¶ 55}** Accordingly, we find appellants' assignments of error not well-taken.

28.

### III.  Conclusion

{¶ 56} Based on the foregoing, the judgment of the Lucas County Court of

Common Pleas is affirmed.  Costs are hereby assessed to appellants in accordance with

App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.


Arlene Singer, J.                            _____
                                                            JUDGE

Stephen A. Yarbrough, P.J.

                                             _____
James D. Jensen, J.                                          JUDGE
CONCUR.

                                             _____
                                                            JUDGE


---

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.sconet.state.oh.us/rod/newpdf/?source=6.