[Cite as *Prey v. Franciscan Univ. of Steubenville*, 2024-Ohio-3087.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
JEFFERSON COUNTY

DALE PREY,

Plaintiff-Appellant,

v.

FRANCISCAN UNIVERSITY OF STEUBENVILLE, ET AL,

Defendant-Appellee.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 24 JE 0004**

---

Civil Appeal from the
Court of Common Pleas of Jefferson County, Ohio
Case No. 22-CV-145

**BEFORE:**
Katelyn Dickey, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

Dale Prey, Plaintiff-Appellant and

*Atty. Adam M. Martello* and *Atty. Derek T. Teeter*, Husch Blackwell LLP, for Defendant-Appellee.

Dated: August 13, 2024

**DICKEY, J.**

{¶1} Appellant, Dale Prey, pro se, appeals the judgment entry of the Jefferson County Court of Common Pleas sustaining the motion to dismiss filed pursuant to Civ.R. 12(B)(1) and 12(B)(6) on behalf of Appellee, Franciscan University of Steubenville ("University"), his former employer, in this action for defamation, tortious interference with contract, civil conspiracy, breach of contract, and fraud against the University and five students identified as "John Does #1-5." Because Appellant predicated his otherwise secular claims on the interpretation of religious doctrine, we find the trial court does not have subject matter jurisdiction over the claims. Accordingly, we affirm the trial court's dismissal of the case pursuant to Civ. R. 12(B)(1).

## STANDARD OF REVIEW

{¶2} A court is required to grant a motion to dismiss pursuant to Civ.R. 12(B)(1) where the court lacks jurisdiction over the subject matter of the litigation. *T & M Machines, LLC v. Yost*, 2020-Ohio-551, ¶ 9 (10th Dist.). " 'Subject-matter jurisdiction of a court connotes the power to hear and decide a case upon its merits.' " *State ex rel. Ohio Democratic Party v. Blackwell*, 2006-Ohio-5202, ¶ 8, quoting *Morrison v. Steiner*, 32 Ohio St.2d 86, 87 (1972), paragraph one of the syllabus.

{¶3} When considering a motion to dismiss pursuant to Civ.R. 12(B)(1), the court must determine "whether any cause of action cognizable by the forum has been raised in the complaint." *State ex rel. Bush v. Spurlock*, 42 Ohio St.3d 77, 80 (1989). "The trial court is not confined to the allegations of the complaint when determining its subject-matter jurisdiction pursuant to a Civ. R. 12(B)(1) motion to dismiss, and it may consider material pertinent to such without converting the motion into one for summary judgment." *Southgate Dev. Corp. v. Columbia Gas Transm. Corp.*, 48 Ohio St.2d 211 (1976), paragraph one of the syllabus.

{¶4} We review the trial court's determination under Civ.R. 12(B)(1) de novo. *In re J.R.P.*, 2018-Ohio-3938, ¶ 24 (7th Dist.). A de novo review requires this Court to independently consider the trial court's judgment without any deference to the trial court's determination. *Id.*

**FACTS AND PROCEDURAL HISTORY**

{¶5} According to the Complaint, the University is a private institution of higher education "which promotes and markets itself based on its 'Passionately Catholic' identity and its compliance with the teachings of the Catholic Church." (Cmplt., ¶ 1.) Appellant was employed by the University in 2001 and began teaching in 2002. In the Spring of 2019, Appellant taught a communications class titled, "Writing for Interactive Media," one day class (COM 381 A) and one night class (COM 381 N).

{¶6} The University utilizes an anonymous course evaluation platform, which allows students to comment on the performance of the professor. The Course Summary Reports for both classes are attached to the Complaint. Four of thirteen students provided evaluations of the day class, eight of fifteen students in the night class provided evaluations.

{¶7} The content and organization of "Writing for Interactive Media," drew considerable and pointed criticism on the platform from the responding night-class students. They wrote that they learned very little and struggled to understand Appellant's expectations regarding class assignments.

{¶8} Further, several comments focused on Appellant's demeanor and the topics he discussed in class. For instance:

> Appellant penned and assigned as required class reading "satirical bible stories," which ridiculed books of the Bible;

> Appellant joked that movies and video games all involve "molesting princesses";

> Appellant told a female student, "[Y]ou are nothing";

> Appellant called a male student "[B]elow [A]verage Joe";

> Appellant greeted the only non-white student in the class by raising his hand as if he were a Native American chief, looked directly at the student and said, "How, white person";

Appellant wasted class time going on tangents and shared his unwanted opinions on various matters;

One student wrote, "I've never had a professor who behaved in such an unprofessional manner, as well as treated his students with such blatant disrespect."

Another student wrote, "We wonder why you have to drag slavery, 9/11, [the burning of] Notre Dame [Cathedral in France], rape and other things that some of us happen to hold very dark and traumatizing connections to, into a class that has nothing to do with those things. But it's just jokes, right? You laugh it off and let the discomfort sit there in the room while we stare at each other in disbelief."

A third student wrote, "Classes included topics non-related to media of any kind, (expected since [Appellant] lives in a cabin by himself off grid where he has zero access to media), topics such as 9/11, [the burning of] Notre Dame [Cathedral in France], racism, slavery, 'molesting princesses' (direct quote), and rape. AND, he did not take these topics as seriously as he should have, but rather made them into his own sadistic jokes."

Finally, a fourth student wrote, "[Appellant] did not live up to the Catholic values that I expect to see from professors at [the University], which makes sense because he himself told us many times how he is not Catholic.

{¶9} Although the reviews of the four responding day students included positive feedback, there were two students from the day class who echoed concerns regarding Appellant's demeanor, class organization, and expectations. Because the day student responses are more favorable than the night student responses, and the day student responses contain no reference to Appellant's age or religion, Appellant reasons the night students "targeted [Appellant] using comments and statements calculated to get a negative response from the University." (*Id.*, ¶ 11.)

**{¶10}** According to the Complaint, Appellant was "reprimanded" by the chair of the Communications Department (pursuant to instructions from the Dean), who informed Appellant that his conduct [as reported in the student comments] was "unacceptable at Franciscan University, and that the information would be made a part of his permanent record and impact his future ability to teach." (*Id.*, ¶ 3.) In response, Appellant prepared a detailed analysis of his course preparation, including citations to "Pope John Paul II's 'Letter of Artists,' and instructions found in Inter Mifica, Communio et Progressio and Aetatis Novae," which he explained were all available on the Vatican website. (*Id.*, ¶ 14.)

**{¶11}** Appellant alleges he worked intently as a non-Catholic to comport his teaching with Catholic doctrine and to refrain from supporting propositions or values contrary to the Church's position. The Complaint reads:

> [Appellant] made great efforts to research the role of communication instruction at a Catholic Institution of Higher Learning and embraced the instructions found in Vatican documents. His satire, contrasting popular ideologies with actual biblical teachings, culminated with Christ's message as it related to the [internet] scandal – which had cost the University so much money and divided the University community. His use of visuals (the black and silver U.S. Olympic uniforms) demonstrated the importance of personal responsibility in selecting what one chooses to wear, if one wishes to conform to Catholic traditions of modesty, rather than projecting that responsibility onto others. His review of the research into "false memories" and the number of persons (often African American males accused of sexual impropriety with White females) who had been exonerated through the Innocence Project reflected the challenging intersection of Catholic Social Justice issues.

(*Id.*, ¶ 20.)

**{¶12}** Appellant filed a complaint with the University accusing the night class students of harassment and discrimination against him based on religion and age. (*Id.*) According to Appellant, the students specifically advanced religion-based criticism in an

effort to injure his professional status and ability to teach at the University. Further, Appellant informed the University of his intent to pursue legal action against the students, should the University fail to "follow its own guidelines, including Mission Statement, etc., and teachings of the Catholic Church (including the importance of 'truthful' communication) and condemn student actions which violated those guidelines and teaching." (*Id.*, ¶ 14.)

{¶13} Appellant demanded the University identify the students and punish them. The University investigated the matter and concluded Appellant had not been the subject of harassment or discrimination, and refused to identify the students.

{¶14} The Complaint alleges the University's decision was contrary to an "Oath of Fidelity" to submit to the teaching of the Pope and the Church undertaken by all upper-level administrators and motivated by a desire to avoid another internet scandal. The Complaint further alleges the University's response "was to reject [Appellant's] efforts to teach material in accordance with Catholic precepts, and conclude that students (who were Catholic) were far more knowledgeable about actual Catholic doctrine." (*Id.*, ¶ 21.)

{¶15} The Complaint reads:

> The religious affiliation of [the University] is part of its primary marketing campaign. When [an internet] scandal cost them millions of dollars the University responded with a very public event where administrators, faculty and staff were seen to be taking the "Oath of Fidelity." A few months later they were concluding that student perceptions of what was appropriate in the classroom were more important than the teachings of Pope John Paul II and the obligations of educators in the field of communications, as set forth in Inter Mifica, Communio et Progressio and Aetatis Novae. Rather than submit to these teachings and the doctrine set forth in the Catechism, they allowed the educational mission and environment to be dictated by a few disgruntled students . . .

(*Id.*, ¶ 24.)

Case No. 24 JE 0004

**{¶16}** As a consequence, Appellant resigned his position. Appellant does not allege he suffered any reduction in pay, demotion, or diminution in benefits prior to voluntarily leaving the University.

**{¶17}** On January 13, 2020, following the issuance of his right to sue letter from the Equal Employment Opportunity Commission, Appellant filed a lawsuit in the United States District Court for the Southern District of Ohio. *See Prey v. Franciscan University of Steubenville, et al.*, No. 20-CV-00188 (S.D. Ohio). Appellant asserted claims against the University under Title VII (religious discrimination) and the Age Discrimination in Employment Act (age discrimination), as well as various state law claims for defamation, tortious interference with a contractual relationship, civil conspiracy, and breach of contract. Appellant joined as unknown "John Doe" defendants the various students who raised concerns about Appellant's conduct in an effort to recover damages for their allegedly false negative comments.

**{¶18}** In an Opinion and Order filed on December 18, 2020, the Southern District Court dismissed Appellant's federal claims against the University for failure to state a claim and denied Appellant's request to take discovery to identify the John Doe defendants. The Southern District Court found the University was a religious employer and statutorily exempt from Title VII's prohibition on religious discrimination, and Appellant failed to exhaust his administrative remedies for his age discrimination claim. The Southern District Court further found Appellant suffered no adverse employment action as a matter of law because the negative student comments did not create a hostile or abusive environment, and would not have caused a reasonable person to resign. Having dismissed Appellant's federal claims, the federal court declined to exercise supplemental jurisdiction over the remaining state law claims.

**{¶19}** Appellant filed a motion for reconsideration, which the Southern District Court denied. Appellant then appealed the decision of the Southern District to the United States Circuit Court of Appeals for the Sixth Circuit, which affirmed the Southern District Court's dismissal of Appellant's federal claims in an unpublished order. *See Prey v. Franciscan University of Steubenville, et al.*, No. 21-/3200 (6th Cir. Nov. 2, 2021).

**{¶20}** On May 2, 2022, Appellant refiled his state claims in the Jefferson County Court of Common Pleas, naming the University and "John Does, #1-5" as defendants.

Appellant reasserted his claims for defamation, tortious interference with contract, civil conspiracy, breach of contract, and fraud.

**{¶21}** The Complaint contains numerous references to Catholic beliefs, papal teachings, and Vatican decrees. For instance, Appellant argues that Catholic teaching permits satire, and accuses the University of violating Catholic Church teachings. In support of his interpretation of Catholic dogma, Appellant attached to his Complaint excerpts from the Catechism of the Roman Catholic Church, the University's statement of its Catholic mission, and a Profession of Faith and Oath of Fidelity.

**{¶22}** Further, the Complaint cites the Catechism to allege that false criticism by the students is an "offense against truth," and that the University "had both a legal (civil law) and a moral (Catholic Church's teachings) to speak 'truth.'" (Cmplt., ¶ 8.) Appellant characterizes the cited Catholic doctrine as admissions of a party opponent.

**{¶23}** On June 1, 2022, the University moved to dismiss the Complaint for lack of subject matter jurisdiction and failure to state a claim. The University alleged the trial court did not have subject matter jurisdiction based on the ecclesiastical abstention doctrine, which deprives civil courts of jurisdiction to sit in judgment of a decision made by a religious entity regarding religious discipline, faith, custom or rule. In the alternative, the University argued the Complaint failed to allege valid state law claims. Appellant filed his response on June 15, 2022, and the University filed its reply on June 22, 2022. The trial court heard oral argument on July 11, 2022.

**{¶24}** On January 18, 2024, the trial court filed the judgment entry on appeal, granting the University's motion and dismissing Appellant's claims with prejudice. The trial court first determined it could not resolve disputed points of religious doctrine, and therefore, Appellant's claims were non-justiciable under the ecclesiastical abstention doctrine. In the alternative, the trial court determined Appellant failed to state one or more of the necessary legal elements of his claims under a traditional Rule 12(B)(6) analysis and that he failed to plead fraud with particularity as required by Rule 9(B). Accordingly, the trial court dismissed Appellant's claims against the University and the John Doe defendants on the alternative ground that he failed to state a claim.

**{¶25}** This timely appeal followed.

**ANALYSIS**

**ASSIGNMENT OF ERROR NO. 1**

**THE TRIAL COURT ERRED WHEN RULING THAT THE ECCLESIASTICAL ABSENTION DOCTRINE COULD BE APPLIED TO AN INDIVIDUAL WHO WAS NEITHER A PRIEST, NOR A CATHOLIC, *IN DIRECT CONFLICT WITH OHIO'S CONSTITUTION* AND THAT THE FEDERAL COURT'S DISMISSAL OF APPELLANT'S TITLE VII CLAIM, BASED ON A BROAD STATUTORY RELIGIOUS EXEMPTION, PRECLUDED APPELLANT'S ABILITY TO BRING STATE LAW CLAIMS, WHERE NO "RELIGIOUS EXEMPTION" APPLIES.**

**{¶26}** It is well established that civil courts lack jurisdiction to hear ecclesiastical disputes within a church, although courts may hear church disputes that are secular in nature. *Watson v. Jones*, 80 U.S. 679 (1871); *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976). The ecclesiastical abstention doctrine is a recognition that all who unite themselves to such a body, i.e., a church, do so with an implied consent to its government and are bound to submit to it. *Ohio Dist. Council, Inc. v. Speelman*, 2016-Ohio-751, ¶ 19 (12th Dist.). "It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for." *Id.*

**{¶27}** "Ohio appellate courts have fashioned the ecclesiastical abstention doctrine into a two-part test to determine whether a court has subject-matter jurisdiction over a church dispute." *Harrison v. Bishop*, 2015-Ohio-5308, ¶ 41 (6th Dist.), citing *Bhatti v. Singh*, 2002-Ohio-3348, ¶ 25 (12th Dist.). First, the court must determine whether the church is hierarchical or congregational. *Slavic Full Gospel Church, Inc. v. Vernyuk*, 2012-Ohio-3943, ¶ 17 (8th Dist.). If the church is hierarchical, civil courts generally lack jurisdiction to hear the dispute. *Tibbs v. Kendrick*, 93 Ohio App.3d 35, 42, (8th Dist.1994). In a hierarchical system, the congregation is subordinate to a general organization, typically consisting of clerics or tribunals, which controls religious or doctrinal policy and

makes decisions for the entire membership. *Shariff v. Rahman*, 2003-Ohio-1336, ¶ 12 (8th Dist.).

**{¶28}** In contrast, in a congregational system, the congregation governs itself; it is subservient to no other body. *Tibbs* at 42, citing *State ex rel. Morrow v. Hill*, 51 Ohio St.2d 74, 76 (1977). If the church is congregational, a civil court has jurisdiction only to determine a narrow issue – whether the proper church authority made the decision regarding an ecclesiastical dispute. *Id.* The ultimate arbiter of the bylaws is the highest authority within the organization, and the court's role is limited to identifying that authority, not reviewing its decision. *Shariff* at ¶ 15.

**{¶29}** Second, courts determine whether the nature of the dispute is ecclesiastical or secular. *Slavic Full Gospel Church* at ¶ 18. This determination involves review of the complaint and counterclaims to identify whether the controversies in each count involve ecclesiastical or secular issues. *Tibbs* at 43. Ecclesiastical matters include decisions about faith, doctrine, and selection of the clergy as well as matters of church government. *Sacrificial Missionary Baptist Church v. Parks*, 1997 WL 812168, *5-6 (8th Dist. Dec. 30, 1997). Civil courts retain jurisdiction over purely secular issues, whether the church is hierarchical or congregational.

**{¶30}** The University argues, "the trial court correctly held that it lacked subject matter jurisdiction over [Appellant's] claims because to resolve those claims *as [Appellant] framed them*, the trial court would have had to resolve disputes over Catholic doctrine and determine whether the University and its students acted in accordance with Catholic doctrine." (Emphasis in original)(Appellee's Brf., p. 9.) In other words, although the University concedes Appellant's claims are secular, it argues the evidence offered by Appellant to prove his underlying claim – the students lied on the anonymous platform in a concerted effort to damage his professional reputation and the University countenanced the deception in order to avoid controversy – is predicated upon violations of Catholic doctrine.

**{¶31}** The Eighth District's recent decision in *Plishka v. Skurla*, 2022-Ohio-4744, ¶ 66-67 (8th Dist.), appeal not allowed, 2023-Ohio-1665, reconsideration denied, 2023-Ohio-2664, and cert. denied, 144 S.Ct. 1058, is instructive. In that case, the Eighth District concluded the ecclesiastical abstention doctrine prohibited the trial court from

considering an abuse of process claim filed by a Byzantine Catholic priest against the Diocese and the Archbishop. In order to establish his abuse of process claim, Father Plishka was required to show the defendants filed a case in which legal procedure has been set in motion in proper form, with probable cause, and even with ultimate success, but has been perverted to accomplish an ulterior purpose for which it was not designed. *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 68 Ohio St.3d 294, 297 (1994), quoting *Keeton, Dobbs, Keeton & Owen, Prosser and Keeton on the Law of Torts*, Section 121, 897 (5th Ed.1984).

**{¶32}** Fr. Plishka's complaint alleged the defendants "misused" a lawsuit against Fr. Plishka for conversion and replevin to summarily and unilaterally suspend Fr. Plishka and harm his credibility and reputation as a Byzantine priest. The complaint further alleged the Diocese filed the lawsuit specifically to avoid its own internal church procedures, which would have entitled Fr. Plishka to notice and the opportunity to be heard before an objective body of the Byzantine Catholic Church.

**{¶33}** The defendants dismissed their conversion and replevin claims against Fr. Plishka, then refiled them. As a consequence, the conversion case and the abuse of process case were consolidated for trial.

**{¶34}** The trial court granted both parties' motions in limine to prohibit the introduction of "all references relating to church proceedings and matters," including evidence of Fr. Plishka's suspension and the "canonical-related events that have followed." *Plishka* at ¶ 36. Ultimately, the trial court entered a directed verdict on the abuse of process claim, finding Fr. Plishka failed to demonstrate the defendants filed the original action to achieve an ulterior purpose. The jury found in favor of defendants on the conversion claim, but awarded no damages.

**{¶35}** On appeal, the Eighth District recognized the abuse of process claim was secular, but found the claim "necessary requires inquiry into ecclesiastical matters, including whether the Diocese's internal procedures permitted it to suspend Fr. Plishka based on the nature of his alleged conduct and the initiation of civil proceedings against him." *Id.* at ¶ 70. Because the forgoing evidence was required to establish the second element of the abuse of process claim, the Eighth District concluded the trial court was without jurisdiction to consider the abuse of process claim. The Eighth District opined,

"[w]ith respect to this issue, the parties have greatly contested one another's interpretation of ecclesiastical text and whether Fr. Plishka's suspension was authorized, and thereby proper, under canon law and the Diocese's internal procedures." *Id.* at ¶ 74.

{¶36} The same is true here. Appellant relies exclusively upon religious doctrine to establish the University's duty to investigate the students' accusations and vindicate Appellant. Specifically, the Complaint alleges "student perceptions of what was appropriate in the classroom were more important [to the University] than the teachings of Pope John Paul II and the obligations of educators in the field of communications, as set forth in Inter Mifica, Communio et Progressio and Aetatis Novae." (Complt., ¶ 24.) The Complaint continues, "[r]ather than submit to these teachings and the doctrine set forth in the Catechism, [the University] allowed the educational mission and environment to be dictated by a few disgruntled students." (*Id.*) Like the abuse of process claim in *Plishka, supra,* Appellant's claims "necessary require[ ] inquiry into ecclesiastical matters," and therefore, fall squarely beyond the trial court's subject matter jurisdiction pursuant to the ecclesiastical abstention doctrine. Accordingly, we find the trial court did not err when it dismissed Appellant's claims pursuant to Civ.R. 12(B)(1), and Appellant's first assignment of error is meritless.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED IN DISMISSING APPELLANT'S DEFAMATION CLAIM *WITHOUT REVIEWING APPELLANT'S ACTUAL COMPLAINT – THAT IT WAS THE STUDENTS WHO ENGAGED IN DEFAMATION* – AND IN ACCEPTING HEARSAY AND SPECULATION TO REBUT APPELLANT'S STATED FACTS IT EXCEEDED THE LIMITS OF 12(B)(6) REVIEW CONVERTING IT INTO A 56(C) MOITON FOR SUMMARY JUDGMENT.**

## ASSIGNMENT OF ERROR NO. 3

**THE TRIAL COURT ERRED IN DISMISSING APPELLANT'S TORTIOUS INTERFERENCE CLAIM *WITHOUT REVIEWING APPELLANT'S***

*ACTUAL COMPLAINT – THAT IT WAS THE STUDENTS WHO ENGAGED IN TORTIOUS INTERFERENCE.*

## ASSIGNMENT OF ERROR NO. 4

THE TRIAL COURT ERRED WHEN IT DISMISSED APPELLANT'S BREACH OF CONTRACT CLAIM BASED ON RES JUDICATA, OR ALTERNATIVELY, THAT APPELLANT HAD PLED NO EVIDENCE OF A CONTRACT – *YET FAILED TO REVIEW THE FACTS IN THE COMPLAINT THAT DOCUMENTED AN 18 YEAR LONG EMPLOYMNET HISTORY*, INCLUDING THE ON-GOING PUBLICATION OF KEY DOCUMENTS AND THE LOGICAL INFERENCES DERIVED FROM THOSE FACTS IN LIGHT OF OHIO LAW.

## ASSIGNMENT OF ERROR NO. 5

THE TRIAL COURT ERRED WHEN IT DISMISSED APPELLANT'S GENERAL FRAUD CLAIM, HOLDING HIM TO A STRICT PLEADING STANDARD, *EVEN THOUGH [THE UNIVERSITY] HAD ACTIVELY SOUGHT TO PREVENT DISCOVERY* USING FEDERAL LAW PROTECTING STUDENT RECORDS AND CONCLUDING THAT APPELLANT'S RELEVANT EVIDENCE — FACTUAL EVIDENCE CONTAINED IN HIS COMPLAINT AND RECOGNIZED BY THE OHIO RULES OF EVIDENCE AS *"PARTY-OPPONENT ADMISSIONS"* WAS *"ACTUALLY"* AN ATTEMPT BY APPELLANT TO GET THE COURT TO IMPERMISSIBLY REVIEW CATHOLIC DOCUMENTS.

## ASSIGNMENT OF ERROR NO. 6

THE TRIAL COURT ERRED WHEN IT FAILED TO FOLLOW ESTABLISHED LAW ON CIVIL CONSPIRACY AND DISMISSED APPELLANT'S CLAIM WHEN THERE WERE ABUNDANT FACTS IN THE CLAIM TO DEMONSTRATE *TWO, OR MORE STUDENTS,* HAD ACTED TO ACHIEVE THE SAME GOAL OF *INJURING APPELLANT* IN

*HIS WORKPLACE / INTERFERING WITH HIS EMPLOYMENT RELATIONSHIP* **AND THAT THE UNIVERSITY HAD PARTICIPATED IN ONE OR MORE WAYS – INCLUDING MAKING STATEMENTS THEY KNEW, OR SHOULD HAVE KNOWN, WERE DEFAMATORY PART [SIC] OF HIS PERMANENT EMPLOYMENT RECORD – THUS** *EXPANDING THE SCOPE OF THE ORIGINAL TORT BEYOND APPELLANT'S CURRENT EMPLOYER TO ESSENTIALLY EVERY INSTUTITION OF HIGHER EDUCATION.*

**{¶37}** Because we find the trial court was without subject matter jurisdiction to consider the claims in the Complaint, we find Appellant's second, third, fourth, fifth, and sixth assignments of error are moot.

## CONCLUSION

**{¶38}** In summary, we find the trial court did not have subject matter jurisdiction to consider the claims in the Complaint pursuant to the ecclesiastical abstention doctrine. Accordingly, the judgment entry of the trial court dismissing the case pursuant to Civ.R. 12(B)(1) is affirmed.

Robb, P.J., concurs.

Hanni, J., concurs.

_____

For the reasons stated in the Opinion rendered herein, the first assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Jefferson County, Ohio, is affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**