[Cite as *Plishka v. Skurla*, 2022-Ohio-4744.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| RICHARD PLISHKA, | : | |
| Plaintiff-Appellant/<br>Cross-Appellee, | : | No. 111122 |
| | : | |
| v. | | |
| | : | |
| WILLIAM SKURLA, ET AL., | | |
| | : | |
| Defendants-Appellees/<br>Cross-Appellants. | : | |

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** December 29, 2022

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CV-18-891709 and CV-18-896359

---

## *Appearances:*

Robinson Law Firm LLC and Emmett E. Robinson, *for appellant/cross-appellee*.

Sutter O'Connell Co., Denise A. Dickerson, and Robert E. Cahill, *for appellee/cross-appellant* William Skurla.

Hahn Loeser & Parks LLP, Steven E. Seasly, and Andrew J. Wolf; Frantz Ward LLP, James B. Niehaus, and Klevis Bakiaj, *for appellee/cross-appellant* Byzantine Catholic Diocese of Parma.

EILEEN T. GALLAGHER, J.:

{¶ 1} Plaintiff-appellant and cross-appellee, Richard Plishka ("Fr. Plishka"), appeals from the denial of his motion for partial summary judgment and the trial court's judgment entering a directed verdict in favor of defendants-appellees and cross-appellants, William Skurla ("Archbishop Skurla") and the Byzantine Catholic Diocese of Parma (the "Diocese") (collectively the "defendants"). Fr. Plishka raises the following assignments of error for review:

1. The trial court reversibly erred with it denied Fr. Plishka's motion for partial summary judgment.

2. The trial court reversibly erred when it barred Fr. Plishka from introducing any evidence related to the "ulterior purpose" element of his abuse-of-process claim.

{¶ 2} In turn, the defendants appeal from the trial court's denial of their motion to dismiss for lack of subject-matter jurisdiction. They raise the following cross-assignment of error for review:

1. The trial court erred when it denied defendants' motion to dismiss for lack of subject-matter jurisdiction.

{¶ 3} After careful review of the record and relevant case law, we reverse the trial court's judgment denying the defendants' motion to dismiss for lack of subject-matter jurisdiction. Fr. Plishka's assignments of error are rendered moot.

## Procedural and Factual History[1]

### A. Statement of the Facts

{¶ 4} In November 2008, Fr. Plishka was ordained as a priest within the Diocese.  In June 2012, Bishop John M. Kudrick ("Bishop Kudrick"), now retired, formally appointed Fr. Plishka as the Director of the Byzantine Catholic Cultural Center (the "Cultural Center").  (Tr. 1160.)  Prior to Fr. Plishka's appointment, the Cultural Center was located at the Diocesan Cathedral Complex in Parma, Ohio.  At Fr. Plishka's urging, however, the Cultural Center was moved into the rectory of a nonactive parish owned by the Diocese, the Holy Ghost Byzantine Catholic Church (the "Holy Ghost Church") located in the Tremont neighborhood of Cleveland, Ohio.

{¶ 5} According to Bishop Kudrick, the Cultural Center's mission was to increase the presence of the Byzantine Catholic Church in the local community, to become a house of prayer, and to serve as the "springboard" to form a men's monastery.  (Bishop Kudrick Aff. ¶ 3.)  To facilitate the goals of the Cultural Center, Fr. Plishka organized men's and women's retreats, sponsored camps for children, participated in Tremont community activities, displayed church-related exhibits,

---

[1] On April 23, 2019, the trial court granted an agreed-upon protective order that required Fr. Plishka and the defendants to file confidential documents under seal.  In this case, various pleadings, briefs, and memorandums were filed under seal in the trial court because they contained explicit references to confidential information.  On appeal, however, the parties have not elected to file their appellate briefs under seal.  Under these circumstances, this court finds that it is appropriate to reference portions of the record cited in the parties' competing briefs to the extent it is necessary to resolve the arguments presented on appeal.

and held worship services.  (Tr. 816, 823.)  The Cultural Center actively operated in the Tremont community for the majority of 2012, 2013, 2014, and 2015.

{¶ 6} However, in a letter dated June 30, 2015, Bishop Kudrick informed Fr. Plishka that the Cultural Center would be closed due to alleged funding issues.[2] (Tr. 1488.)  At that time, Bishop Kudrick directed Fr. Plishka to transfer "any and all items [from the Cultural Center], other than those personally owned, to the Cathedral Complex so the real property may be prepared for alienation." (Tr. 1086-1087, 1489; Bishop Kudrick depo., exhibit E.)  On September 4, 2015, Bishop Kudrick issued a decree, formally relieving Fr. Plishka of his duties at the Cultural Center.  (Tr. 1088; Bishop Kudrick depo., exhibit F.)

{¶ 7} Following various disagreements concerning Fr. Plishka's next assignment and the terms of his request for a leave of absence, Fr. Plishka was instructed to remove his belongings from the Holy Ghost Church by February 14, 2016. (Bishop Kudrick depo. at 126.)  Ultimately, Fr. Plishka vacated the Holy Ghost rectory on May 31, 2016.  (Bishop Kudrick depo., exhibit No. 46; tr. 1498-1499, 1560.)

{¶ 8} On May 4, 2016, Archbishop Skurla was appointed the Apostolic Administrator of the Parma Diocese.  Upon his appointment, Archbishop Skurla was notified that certain property belonging to the Diocese was removed from the

---

[2] At the time of his deposition, however, Bishop Kudrick testified that the Diocese directed him to transfer Fr. Plishka from the Cultural Center "in response to numerous and preoccupying complaints" regarding Fr. Plishka's conduct.  (Bishop Kudrick depo. at 47.)  Bishop Kudrick conceded that he did not share this information with Fr. Plishka. (*Id.* at 78-80.)

Cultural Center when Fr. Plishka vacated the Holy Ghost Church. (Archbishop Skurla Aff. ¶ 11.) The items taken from the rectory included various pieces of furniture and relics of the Blessed Pavel Gojdich and Blessed Basil Hokko, which "are small pieces of bone of the particular saint." (Tr. 654-658, 849.)

{¶ 9} Archbishop Skurla testified that he immediately directed Father James Batcha ("Fr. Batcha"), the Diocesan finance officer, and John Popp ("Popp"), who was assigned the new director of the Cultural Center, to investigate the allegations levied against Fr. Plishka by his colleagues. (Archbishop Skurla Aff. ¶ 12; tr. 658-659.) At the conclusion of his investigation, Popp generated an inventory of all items missing from the Cultural Center. The inventory list and corresponding receipts were then forwarded to Fr. Nicholas Rachford, the Diocese's Judicial Vicar, who shared the list with Fr. Plishka's legal representatives. (Archbishop Skurla Aff. ¶ 20.)

{¶ 10} After numerous attempts to recover the Diocese's property from Fr. Plishka, including an in-person meeting held on December 12, 2016, the Diocese engaged civil counsel. (Archbishop Skurla Aff. ¶ 26; tr. 701.) On March 28, 2017, counsel for the Diocese sent a letter to Fr. Plishka demanding that he identify the location of the Diocese's property and make arrangements for the Diocese to retrieve the property by April 7, 2017. (Archbishop Skurla Aff. ¶ 28; tr. 702.) When Fr. Plishka did not comply with the Diocese's initial demands, a second letter, dated April 13, 2017, was sent to Fr. Plishka, requesting an immediate response to the March 28, 2017 demand letter. (Archbishop Skurla Aff. ¶ 29; tr. 726.) Again, no response was received. (Tr. 728.)

**B. The Diocese's Original Complaint for Conversion and Replevin**

{¶ 11} On May 31, 2017, the Diocese filed a complaint against Fr. Plishka in Cuyahoga C.P. No. CV-17-881086, asserting claims for conversion and replevin. In the complaint, the Diocese alleged that Fr. Plishka was unlawfully in possession of the Diocese's property, including "religious, spiritual, and liturgical items; religious relics and reliquary boxes; and furnishings of the [Byzantine Catholic Cultural Center]." The complaint sought damages and an order requiring Fr. Plishka to return the subject property to the Diocese.

{¶ 12} During the pendency of Case No. CV-17-881086, the Diocese issued a decree (the "Suspension Decree"), dated July 20, 2017, suspending Fr. Plishka from ministry. The Suspension Decree stated, in pertinent part:

> Whereas canon 1517 § 1 of the Code of Canons of the Eastern Churches states "before issuing an extrajudicial decree, an authority is to seek out the necessary information and proofs, hear or consult those whom the decree directly touches and especially those whose rights can be injured," and;
>
> Whereas the undersigned has sought and received the necessary information and proofs, and; whereas civil lawsuits have been lodged in the civil court of the United States against the Reverend Richard Plishka, in which Reverend Plishka has been accused to have violated the norm of canon 1449 ("a person who alienated ecclesiastical goods without the prescribed consent or permission is to be punished with an appropriate penalty"), and;
>
> Whereas such an accusation is of such a serious nature and has caused scandal so as to question suitability of Reverend Plishka's ministry in the local church to which the undersigned has been entrusted;
>
> The undersigned decrees that:

> The Reverend Richard Plishka is to be suspended from the exercise of his priestly ministries, including the celebration of the Divine Liturgy depending on the outcome of the resolution of said civil lawsuits.

{¶ 13} On July 30, 2017, the Diocese notified its parishioners that it had suspended Fr. Plishka through the Diocesan newspaper, Horizons. The public notification stated that "Father Richard Plishka was suspended from priestly ministries, including the celebration of Divine Liturgy, effective July 20, until further notice." The publication did not state the grounds supporting Fr. Plishka's suspension.

{¶ 14} On July 21, 2017, Bishop Milan Lach ("Bishop Lach") succeeded Archbishop Skurla as the Apostolic Administrator of the Eparchy of Parma. (Lach depo. at 6-7.) On August 7, 2017, Bishop Lach temporarily lifted Fr. Plishka's suspension. (Bishop Lach depo. at 46; tr. 1805.) On August 14, 2017, Bishop Lach rescinded the suspension in its entirety and clarified that Fr. Plishka "continues to be a priest in good standing * * * and is entitled to exercise priestly ministry." (Bishop Lach depo. at 53, exhibit No. 6; tr. 1806.)

{¶ 15} On September 7, 2017, the Diocese voluntarily dismissed Case No. 17-CV-881086, purportedly to "help [Fr. Plishka]," and to "resolve things with him other than through judicial means." (Bishop Lach depo. at 57; tr. 428.)

### C. Fr. Plishka's Complaint for Abuse-of-Process

{¶ 16} On January 17, 2018, Fr. Plishka filed a complaint against the Diocese and Archbishop Skurla in Cuyahoga C.P. No. CV-18-891709. The complaint set forth a single claim for abuse-of-process, alleging

[t]he defendants did not file their [original] complaint against plaintiff for its stated purpose — to recover allegedly converted property and/or to receive just compensation. Instead, the defendants misused, and misapplied, the lawsuit to accomplish an end other than that which it was purportedly assigned to accomplish — to summarily and unilaterally suspend plaintiff and harm his credibility and reputation as a Byzantine priest.

{¶ 17} The complaint further asserted that the defendants initiated their lawsuit in Case No. CV-17-881086 to avoid the Diocese's own internal procedures, which would have entitled Fr. Plishka to notice and the opportunity to be heard before an objective body of the Byzantine Catholic Church.

### D. The Diocese's Second Complaint

{¶ 18} On April 17, 2018, the Diocese filed a second complaint against Fr. Plishka in Cuyahoga C.P. No. CV-18-896359, asserting claims for conversion, theft, and unjust enrichment. Consistent with the original complaint, the second complaint alleged that Fr. Plishka exercised wrongful dominion and control over Diocesan property by removing valuable property and relics from the Cultural Center without authorization. The second complaint further alleged that Fr. Plishka misused the Diocesan credit card to pay for his own personal expenses, including "over $1,000 worth of clothing for his personal use," and "over $8,000 worth of personal restaurant expenses for dinners at restaurants[.]" The second complaint sought judgment for the value of the property wrongfully taken, "including the value of all personal expenses charged to the Diocesan credit card and all property wrongfully taken from the Cultural Center." The second complaint also sought

treble damages, punitive damages, and attorney fees pursuant to R.C. 2307.60 and 2307.61.

{¶ 19} On July 11, 2018, the trial court consolidated Case Nos. CV-18-891709 and CV-18-896359.

**E. Motion to Dismiss for Lack of Subject-Matter Jurisdiction**

{¶ 20} On April 23, 2019, the defendants filed a joint motion to dismiss Fr. Plishka's abuse-of-process claim for lack of subject-matter jurisdiction. The motion, which was filed under seal, argued that the trial court lacked jurisdiction to consider Fr. Plishka's claim under the First and Fourteenth Amendments to the United States Constitution because the claim would require the court to intervene in an ecclesiastical matter. Fr. Plishka opposed the motion, arguing that his abuse-of-process claim is inherently secular and "does not require interpretation of church documents or a determination of the merits of [his] suspension."

{¶ 21} On May 22, 2019, the trial court denied the motion to dismiss, stating, in pertinent part:

> Plaintiff's claim for an abuse-of-process stems from Defendants' initial filing of a conversion and replevin action. The court finds that a claim for abuse-of-process is independent of any ecclesiastical matters and does not require interpretation of the church documents, internal church procedures, or a determination of the merits of Fr. Plishka's suspension.
>
> Having construed the material allegations in the pleadings with reasonable inferences to be drawn therefrom, in favor of the non-moving party, the court finds that Plaintiff's complaint states facts demonstrating a viable claim for relief for abuse-of-process. As such, the court finds that dismissal of Plaintiff's complaint is not proper and

movants are not entitled to judgment as a matter of law pursuant to Civ.R. 12(B)(1).

{¶ 22} On June 21, 2019, the defendants filed an application for a writ of prohibition in the Ohio Supreme Court, requesting the court to prevent the trial court "from exercising judicial power in a lawsuit over which the Cuyahoga County Court of Common Pleas lacks subject-matter jurisdiction." The defendants reiterated their position that Fr. Plishka's abuse-of-process claim amounted to an attempt to challenge the Diocese's decision to suspend him from priestly ministry — an issue that would require the trial court to intervene in an ecclesiastical dispute.

{¶ 23} On December 24, 2019, the Ohio Supreme Court dismissed the application without an opinion. *State ex rel. Skurla v. Miday*, 157 Ohio St.3d 1516, 2019-Ohio-5289, 136 N.E.3d 516.

### F. Competing Motions for Summary Judgment

{¶ 24} On May 1, 2020, Fr. Plishka filed a motion for partial summary judgment on his abuse-of-process claim, arguing that "the pleadings, and defendants' own testimony, established that [he] is entitled to summary judgment on the issue of liability — the first two elements of abuse-of-process." Specifically, Fr. Plishka argued that the evidence attached to his motion unequivocally established that the defendants perverted the abusive lawsuit by using it to accomplish an ulterior purpose. In support of his position, Fr. Plishka asserted that the evidence unambiguously confirmed that (1) "the Diocese had used the pendency of the abusive lawsuit to summarily suspend Fr. Plishka from priestly ministry

without the otherwise-required canonical hearing and proofs," (2) Fr. Plishka's summary suspension "was ulterior to the abusive lawsuit," and (3) "the suspension from priestly duties was a remedy which the court itself was powerless to order."

{¶ 25} Fr. Plishka's motion incorporated copies of (1) his own affidavit; (2) the affidavits of Bishop Kudrick; (3) the deposition testimony of Archbishop Skurla, Bishop Kudrick, Bishop Lach, and John Popp; and (4) a copy of the July 20, 2017 Suspension Decree.[3]

{¶ 26} On July 1, 2020, the defendants filed separate motions for summary judgment as to the abuse-of-process claim. Specifically, the Diocese argued that "the undisputed evidence demonstrates that Fr. Plishka's claim fails as a matter of law because he cannot demonstrate that the Diocese perverted its original lawsuit to accomplish an ulterior purpose, and Fr. Plishka cannot demonstrate that he suffered any damages as a direct result of the Diocese's use of process." The Diocese maintained that the evidence clearly establishes that they filed the original complaint against Fr. Plishka to facilitate a legal remedy that only the common pleas court was empowered to give – an order requiring Fr. Plishka to return the Diocesan property in his possession. Alternatively, the Diocese restated its position that the trial court lacked subject-matter jurisdiction to consider Fr. Plishka's claim because

---

[3] On August 3, 2020, the defendants filed separate briefs in opposition to Fr. Plishka's motion for partial summary judgment on his abuse-of-process claim. Collectively, the opposition briefs reiterated arguments set forth in the defendants' own motions for summary judgment.

"Fr. Plishka's suspension, a form of ecclesiastical discipline, lies at the heart of his claim."

{¶ 27} Archbishop Skurla similarly argued that he was entitled to summary judgment "because no judicial process was abused, Fr. Plishka's suspension was proper under canon law, and the propriety of Fr. Plishka's suspension is an ecclesiastical matter governed by the Catholic Church's canon law and the ecclesiastical abstention doctrine precludes this court from exercising jurisdiction over this matter."

{¶ 28} In support of their separate motions for summary judgment, the defendants attached (1) the affidavits of Archbishop Skurla and Reverend Monsignor Frederick C. Easton ("Monsignor Easton"); (2) an inventory of property missing from the Cultural Center following Fr. Plishka's departure on May 31, 2016; (3) demand letters sent to Fr. Plishka; (4) a report authored by Fr. Rachford following his meeting with Fr. Plishka on December 12, 2016; (5) a copy of the July 20, 2017 Suspension Decree; and (6) the depositions of Fr. Plishka, Fr. Steven Titko, Bishop Milan Lach, John Popp, and Archbishop Skurla.[4]

{¶ 29} The parties also filed competing motions for summary judgment as to the Diocese's claims against Fr. Plishka. In its motion for partial summary judgment "on liability for all claims against Fr. Plishka," the Diocese argued as follows:

> There are no disputed issues of material fact that Fr. Plishka converted Diocesan property by exercising wrongful domination and control over

---

[4] On August 3, 2020, Fr. Plishka filed a consolidated brief in opposition to the defendants separate motions for summary judgment on his abuse-of-process claim.

relics and furniture, and charging Diocesan credit cards for many personal purchases without any substantiation as to their potential legitimate Diocesan purpose. Moreover, because Fr. Plishka misused the Diocesan credit card and wrongfully took Diocesan property and relics, this constitutes a theft offense pursuant to R.C. 2913.01(K), and the Diocese is entitled to recover treble damages, along with punitive damages and attorneys' fees pursuant to R.C. 2307.60(A) and 2307.61. Lastly, because Fr. Plishka wrongfully retained the benefit of the Diocesan property and credit card, he has been unjustly enriched.

{¶ 30} In support of its motion for partial summary judgment, the Diocese attached (1) the affidavits of Bishop Kudrick and Fr. Dennis Hrubiak; (2) the depositions of Fr. Plishka, Fr. Steven Titko, John Popp, and Bishop Kudrick (3) a June 28, 2010 memo to all pastors/administrators; (4) an inventory list of credit-card transactions; (5) a letter from Cardinal Leonardo Sandri, dated June 26, 2013; and (6) various correspondences between Fr. Plishka and Bishop Kudrick.

{¶ 31} In turn, Fr. Plishka filed his own motion for partial summary judgment on the Diocese's conversion claims, arguing "the Diocese's claims of conversion, theft, and unjust enrichment based on [his] purported unauthorized use of his Diocesan credit card fail as a matter of law." Fr. Plishka asserted that the Diocese categorically failed to produce any evidence that a single credit-card transaction was unauthorized. In support of his motion for partial summary judgment, Fr. Plishka attached (1) his own affidavit; (2) the affidavits of Bishop Kudrick and Fr. Steven Titko; (3) the affidavits of Bishop Kudrick; (3) the deposition testimony of Archbishop Skurla, Bishop Kudrick, Bishop Milan Lach, and John Popp; (4) a redacted inventory of credit-card transactions made by Fr. Plishka

between 2012 and 2016; (5) a letter from counsel for the Diocese, dated August 15, 2018; and (6) various copies of discovery filings.

{¶ 32} On October 19, 2020, the trial court issued a four-page judgment entry denying the parties' competing motions for summary judgment. Regarding the abuse-of-process claim, the trial court stated as follows:

> In viewing the facts and construing the evidence in the light most favorable to the non-moving parties, the court finds that Fr. Plishka is not entitled to summary judgment as a matter of law as to the abuse-of-process claim. The court finds that there are genuine issues of material fact concerning the Diocese's claims for conversion, and why the Diocese dismissed the first action for conversion and replevin and filed another lawsuit against Fr. Plishka.
>
> In viewing the facts and construing the evidence in a light most favorable to Fr. Plishka as the non-moving party, the court finds that William Skurla and the Diocese are not entitled to summary judgment as a matter of law regarding the liability on Fr. Plishka's abuse-of-process claim and damages. As stated by the court in the ruling on the motion for judgment on the pleadings, Fr. Plishka's claim for abuse-of-process is based upon much more than the mere filing of a complaint and Fr. Plishka's complaint sets [forth] operative facts to support its claims. There are genuine issues of material fact concerning whether the Diocese or Skurla perverted an element of process to accomplish an ulterior purpose. Furthermore, as stated by this court in the ruling on the motion to dismiss, Fr. Plishka's claim for abuse-of-process stems from the Diocese's initial filing of the conversion and replevin action, thus, a claim for abuse-of-process is independent of any ecclesiastical matters and does not require interpretation of church documents/procedures.

{¶ 33} Similarly, the trial court found there remained genuine issues of material fact as to the conversion claims, stating:

> In viewing the facts and construing the evidence in a light most favorable to the Diocese as the non-moving party, the court finds Richard Plishka is not entitled to summary judgment as a matter of law as to the conversion claims. There are genuine issues of fact concerning

whether any of the credit card transactions at issue were made for Richard Plishka's personal benefit.

In viewing the facts and construing the evidence in a light most favorable to Richard Plishka as the non-moving party, the court finds that the Diocese is not entitled to summary judgment as a matter of law as to the conversion claims. There are genuine issues of material fact concerning whether certain credit card transactions were authorized or made in furtherance of Fr. Plishka's work for the Diocese, and whether any of the property at issue and/or relics were entrusted to Fr. Plishka.

## G. Motions in Limine

{¶ 34} On July 6, 2021, Fr. Plishka filed a motion in limine, requesting the trial court "to preclude at trial any testimony regarding, reference to, and/or documents relating to church proceedings, as they are irrelevant to this lawsuit, they are unduly prejudicial, and they will confuse the jury." Fr. Plishka further requested "that the characterization of the reason/basis for [his] claim of abuse-of-process be limited to a phrase such as 'defendants' filing of this lawsuit for church-related reasons, rather than for return of property,' without going into specifics." In the memorandum in support of the motion, Fr. Plishka argued that the trial court was required to preclude all references to ecclesiastical matters in this case because his claim for abuse-of-process is strictly secular. He emphasized his position as follows:

> A good deal of irrelevant matter and material have been discussed and litigated in this case – matters and materials involving the Catholic Church's discipline, internal organization, ecclesiastical rule, and laicization process. Such matters are beyond this court's jurisdiction and thus the jury's purview due to the ecclesiastical abstention doctrine.

> For example, specific references to church processes, *suspensions from church related duties*, and/or reinstatement to church related duties, are not only irrelevant, but also deal directly with the Catholic Church's

discipline, internal organization, and ecclesiastical rule, and as such, are beyond this court's jurisdiction and the jury's purview.

(Emphasis added.)

{¶ 35} On the same day, the defendants filed a motion in limine, seeking to exclude any reference to the July 20, 2017 Suspension Decree and the ongoing administrative penal process. The defendants argued that the Suspension Decree and the ongoing administrative process "are ecclesiastical actions and * * * are not the proper subject of review by the jury."

{¶ 36} On July 13, 2021, Fr. Plishka filed a brief in response to the defendants' motion in limine. In pertinent part, Fr. Plishka expressed that he did not oppose their request "to exclude evidence of the July 20, 2017 [Suspension Decree], or the canonical-related events that have followed, as long as the court granted his motion to preclude all references to all testimony * * * relating to church proceedings/matters."

{¶ 37} In turn, the defendants' filed a response to Fr. Plishka's motion in limine, agreeing that it was appropriate to exclude all references to "church related proceedings/matters," including Fr. Plishka's July 20, 2017 suspension.

{¶ 38} On September 22, 2021, the trial court issued an order (the "Exclusion Order"), granting the Diocese's "motion in limine to exclude evidence of Fr. Plishka's July 20, 2017 suspension and his administrative appeal process." The court further granted, in part, Fr. Plishka's "motion to preclude all references to, all testimony

regarding, and all documents relating to church proceedings/matters." The trial

court's order provides, in pertinent part:

> No party or counsel shall offer any evidence of, or reference in any way, Fr. Plishka's July 20, 2017 suspension, the publication of such suspension, Fr. Plishka's Administrative Penal Process or matters and materials involving the Catholic Church's discipline, internal organization, ecclesiastical rule, and laicization process. The parties and counsel may characterize the basis for Fr. Plishka's abuse-of-process claim in any accurate way that is not inconsistent with the foregoing limitation.

{¶ 39} The trial court further determined that it was appropriate to preclude

canon-law expert, Monsignor Easton, from testifying on behalf of the defendants at

trial.

### H. Motion to Amend the Exclusion Order

{¶ 40} On the day of trial, Fr. Plishka filed "a motion to amend court's [July

13, 2021] ruling precluding mention of Plishka's [July 20, 2017] suspension,

Plishka's administrative panel process, etc." In the motion to amend, Fr. Plishka

acknowledged that his own motion in limine sought to preclude "specific references

to [his] suspension from church related duties." However, having recognized the

evidentiary implications of the language used in the motion in limine, Fr. Plishka

attempted to clarify his position by arguing that he should be permitted to introduce

a redacted version of the July 20, 2017 Suspension Decree given its direct relevancy

to his abuse-of-process claim. Fr. Plishka reiterated his position that the original

lawsuit was only filed to improperly effectuate his suspension and that any reference

to the fact of his suspension would not require the trier of fact to interpret canon or ecclesiastical law.

{¶ 41} The substance of the motion to amend was debated extensively on the record. In pertinent part, counsel for Fr. Plishka argued that it was inappropriate to bar any mention of his July 20, 2017 suspension because the term "suspension" is not an ecclesiastical word or phrase. Counsel indicated that she did not intend to argue at trial whether the suspension "was appropriate or not" under canon law and procedure. (Tr. 221.) Rather, she intended to introduce evidence of Fr. Plishka's suspension only to show that "the lawsuit was filed on May 31, 2017, so that canonical proceedings could be started against [Fr. Plishka]." (Tr. 221.)

{¶ 42} In response, counsel for the Diocese argued that the trial court's decision to preclude any reference to Fr. Plishka's suspension from the ministry was expressly premised on Fr. Plishka's own motion in limine and his request to exclude "specific references to church processes, suspensions from church related duties, and/or reinstatement to church related duties." Thus, counsel for the Diocese asserted that Fr. Plishka invited the trial court's ruling and that the Diocese would be prejudiced if the trial court amended its judgment on the day of trial. Counsel indicated that "the defense certainly relied on the rulings" in preparation for trial, and that if the trial court permitted Fr. Plishka to "get into the suspension, * * * it opens the door to [canonical issues]." (Tr. 221.)

{¶ 43} After careful consideration, the trial court denied Fr. Plishka's motion to amend the September 22, 2021 order, and the matter proceeded to trial on

October 26, 2021. The court later reiterated that the Exclusion Order stands, stating,

> I'm not going back on a motion that does affect the entire trial strategy for one of the parties. I can't do that. I'm not going to do it.

(Tr. 347.)

## I. Trial and Directed Verdict

{¶ 44} At trial, Fr. Plishka provided extensive testimony concerning the circumstances that led to his placement at the Cultural Center, his specific responsibilities as the director of the Cultural Center, and the efforts he took to furnish the Holy Ghost Church, expand the Cultural Center's programming, and develop relationships in the community. Fr. Plishka confirmed that in the spring of 2012, the Diocese granted him access to a credit card that was intended to be used to facilitate business on behalf of the Diocese. During his direct-examination, Fr. Plishka was questioned about various charges on the Diocese's credit card, including extravagant meals purchased at local restaurants, travel expenses, purchases of furniture or household items, purchases at area grocery stores, and purchases at various retail stores. Fr. Plishka vehemently denied ever using the Diocese's credit card for personal reasons and maintained that all purchases were related to legitimate business operations and his efforts to facilitate donations, develop church-related programs, and entertain visitors of the Cultural Center.

{¶ 45} Regarding the property allegedly taken from the Cultural Center without authorization, Fr. Plishka maintained that many of the items listed in the

inventory list were either purchased by Fr. Plishka with his own money or was donated to him personally by other members of the church. Fr. Plishka did, however, concede that he gave away certain property belonging to the Diocese, including (1) four outdoor space heaters, (2) an outdoor umbrella, (3) a "red and white enamel table," and (4) pieces of dinnerware. (Tr. 888.) Fr. Plishka indicated that he believed it was appropriate to give the foregoing furniture away to individuals who had volunteered their time and effort to the Cultural Center. (Tr. 888.) Fr. Plishka further conceded that he was in possession of certain property purchased with Diocesan funds, including (1) five icon stands, (2) one York sofa, and (3) a desk pedestal.

{¶ 46} Finally, Fr. Plishka did not dispute that he had possession of two relics that were sent to the Cultural Center by Archbishop Jan Babjak ("Archbishop Babjak") of Slovakia in 2012. Fr. Plishka maintained, however, that the Diocese did not own the relics and that he was the intended guardian of the relics. According to Fr. Plishka, the relics "are properly in my guardianship, so the Eparchy doesn't have any right to demand them." (Tr. 1033.) Fr. Plishka further stated that he was "given permission to keep possession of the relics" by Bishop Kudrick. (Tr. 1154-1155.) Fr. Plishka conceded, however, that Bishop Kudrick was not serving as the acting Bishop at the time Fr. Plishka moved out of the Cultural Center and, therefore, did not have the authority to grant Fr. Plishka ownership of church property.

{¶ 47} On cross-examination, Fr. Plishka agreed that it was his responsibility as the director of the Cultural Center to keep accurate financial records and "make

sure the money was spent properly." (Tr. 1163.)  Despite this obligation, however, Fr. Plishka confirmed that he could not produce any of the receipts for the "over $22,000" worth of purchases made "during the time period while [he was] in charge of the finances at the Cultural Center." (Tr. 1167; 1262.).  Fr. Plishka further agreed that the financial records kept at the Cultural Center were often vague and did not indicate the business purpose of each expense.  For instance, the documentation supporting many of the meals purchased at local restaurants did not list who accompanied Fr. Plishka at the restaurant or the express purpose of the dinner meeting.  Nevertheless, Fr. Plishka remained adamant that the purchases made with the Diocese credit card were business related, although he was unable to recall the purpose of each purchase in the absence of corresponding receipts.

{¶ 48} Regarding the relics, Fr. Plishka testified that he did not respond to formal requests made at the behest of Archbishop Skurla to return the relics to the Diocese.  In addition, Fr. Plishka confirmed that he received a letter from Archbishop Babjak, dated October 25, 2021, wherein Archbishop Babjak asked Fr. Plishka to honor his original intentions and return the relics to the Eparchy of Parma.  Despite Archbishop Babjak's request, however, Fr. Plishka testified that he was not required to return the relics to the Diocese, stating,

> The Archbishop gave [the relics] to me and to Bishop Kudrick.  Bishop Kudrick entrusted them to me.  You don't give someone something and then ask for it back.

(Tr. 182.)

{¶ 49} In the midst of Fr. Plishka's testimony, the parties continued to debate the scope and breadth of the trial court's Exclusion Order.  In an effort to set forth the grounds supporting the abuse-of-process claim, counsel for Fr. Plishka reiterated her argument that it was appropriate to question Fr. Plishka about his suspension without delving into ecclesiastical issues, such as whether the suspension was right or wrong under canon law.  Alternatively, counsel argued that it was appropriate, at the very least, to question Fr. Plishka about the defendants' "ulterior purpose" in filing the original lawsuit without the term "suspension."

{¶ 50} In each instance, the trial court denied counsel's proposed line of questioning and emphasized that Fr. Plishka was not permitted to answer any questions relating to his suspension or other church proceedings.  The court explained its evidentiary rulings as follows:

> This is where we're going to have an issue.  Any evidence or reference in any way — to the suspension.  So when you say a church matter or you say another process or whatever — however you characterize it, it is a reference to the suspension, the publication or any of the other processes.

(Tr. 945-946; 950-951.)  The court further reasoned that the defense would be unable to cross-examine Fr. Plishka about the proposed references to the suspension or church proceedings without violating the Exclusion Order and that the vagueness of the proposed lines of questioning would lead to jury confusion. (Tr. 977; 980; 998.)

{¶ 51} Finally, the court reiterated that the limitations placed on the introduction of evidence stemmed directly from Fr. Plishka's own motion in limine, stating:

> So until [your motion in limine] was filed, certain information could have come in. I granted the motion. The defense agreed with that motion that you filed. And we're at the point right now where we can't unwind that. We can't. I can't change the meaning and the — I can't reinterpret the order that I put on the docket leading up to this trial. * * * And what precipitated all of this was the motion in limine filed by Father Plishka.
>
> * * *
>
> [Plaintiff's counsel], you prevented yourself by filing that motion in limine. That's — bottom line — it is what it is.
>
> * * *
>
> [Plaintiff's counsel], you keep losing sight of the overarching issue here; but for the motion in limine you could have made references.

(Tr. 950-951; 970; 980.)

{¶ 52} At the conclusion of Fr. Plishka's case, the defendants jointly moved for a directed verdict on Fr. Plishka's abuse-of-process claim pursuant to Civ.R. 50(a). The defendants' argued that

> [a]fter nearly three weeks of trial, Fr. Plishka has failed to offer any admissible evidence to establish the required elements of the abuse-of-process claim. Specifically, Fr. Plishka has failed to offer admissible evidence to establish how the process was perverted during the underlying lawsuit, and he has failed to offer any evidence — any admissible evidence of direct damages arising from the alleged abuse-of-process.

(Tr. 2054-2055.)

{¶ 53} In response, counsel for Fr. Plishka asserted that

[a reasonable jury] can find that when the — lawsuit was filed, it was filed for proper purposes, but it was perverted for the ulterior purpose of harming Richard's reputation, because Archbishop Skurla had a vendetta against Richard.

(Tr. 2063.)

{¶ 54} Following an extensive discussion on the record, the trial court granted the motion for a directed verdict, stating, in relevant part:

As to the first element [of an abuse-of-process claim], the initial conversion lawsuit that was dismissed was filed in good form and with probable cause.

As to the second element, plaintiff is unable to meet the second prong, that is whether the legal proceeding was perverted in order to achieve an ulterior motive for which it was not designed.

The 8th District Court of Appeals has held that there must be some further action taken involving the use of process in order to establish an abuse-of-process claim.

* * *

Fr. Plishka has not established the second element to show the ulterior motive, whether it be the suspension or reputational harm arising from a perceived animus by the defendants.

Direct damages must result from the wrongful use of process. Since that element has not been established, no damages can be awarded.

The defendants' renewed motion for a directed verdict pursuant to Civil Rule 50(a) is granted.

(Tr. 2073-2074.)

{¶ 55} On November 19, 2021, the jury returned a verdict in favor of the Diocese, finding that the Diocese was entitled to possession of the missing relics and damages in the amount of zero dollars. (Tr. 2314-2315.)

{¶ 56} The parties now bring this appeal and cross-appeal.

## Law and Analysis

{¶ 57} For the purposes of this appeal, we begin by addressing the arguments set forth in the defendants' cross-appeal. In their sole cross-assignment of error, the defendants argue that the trial court erred in denying their motion to dismiss Fr. Plishka's abuse-of-process claim for lack of subject-matter jurisdiction. Relying on the mandates of the ecclesiastical abstention doctrine, the defendants contend that the record clearly establishes that Fr. Plishka's abuse-of-process claim challenges (1) the propriety of his suspension from ministry, (2) the ecclesiastical procedure by which the suspension was entered, and (3) the damages arising from the publication of his suspension from priestly ministry.

## A. Standard of Review

{¶ 58} Civ.R. 12(B)(1) provides for the dismissal of a complaint for "lack of jurisdiction over the subject matter." The issue of subject-matter jurisdiction involves "a court's power to hear and decide a case on the merits and does not relate to the rights of the parties." *Vedder v. Warrensville Hts.*, 8th Dist. Cuyahoga No. 81005, 2002-Ohio-5567, ¶ 14, citing *State ex rel. Tubbs Jones v. Suster*, 84 Ohio St.3d 70, 75, 701 N.E.2d 1002 (1998). A lack of subject-matter jurisdiction can be raised at any time, because "jurisdiction is a condition precedent to the court's ability to hear the case. If a court acts without jurisdiction, then any proclamation by that court is void." *Suster* at 75, citing *Patton v. Diemer*, 35 Ohio St.3d 68, 518 N.E.2d 941 (1988).

{¶ 59} We review a Civ.R. 12(B)(1) motion to dismiss for lack of subject-matter jurisdiction de novo. *Rheinhold v. Reichek*, 8th Dist. Cuyahoga No. 99973, 2014-Ohio-31, ¶ 7. When ruling on a Civ.R. 12(B)(1) motion, the trial court must determine whether a plaintiff has alleged any cause of action that the court has authority to decide. *Id.* "The trial court is not confined to the allegations of the complaint when determining its subject-matter jurisdiction pursuant to a Civ. R. 12(B)(1) motion to dismiss, and it may consider material pertinent to such without converting the motion into one for summary judgment." *Southgate Dev. Corp. v. Columbia Gas Transm. Corp.*, 48 Ohio St.2d 211, 358 N.E.2d 526 (1976), paragraph one of the syllabus.

### B The Ecclesiastical Abstention Doctrine

{¶ 60} It is well established that civil courts lack jurisdiction to hear ecclesiastical disputes within a church, although courts may hear church disputes that are secular in nature. *Watson v. Jones*, 80 U.S. 679, 20 L.Ed. 666 (1871); *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). This is known as the ecclesiastical abstention doctrine. *Harrison v. Bishop*, 2015-Ohio-5308, 44 N.E.3d 350, ¶ 19 (6th Dist.). The doctrine is a recognition that all who unite themselves to such a body, i.e., a church, do so with an implied consent to its government and are bound to submit to it. *Ohio Dist. Council, Inc. v. Speelman*, 2016-Ohio-751, 47 N.E.3d 954, ¶ 19 (12th Dist.). "It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be

binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for." *Id.*

{¶ 61} "Generally, the question of who will preach from the pulpit of a church is an ecclesiastical question, review of which by the civil courts is limited by the First and Fourteenth Amendments to the United States Constitution." *Tibbs v. Kendrick*, 93 Ohio App.3d 35, 41, 637 N.E.2d 397 (8th Dist.1994), citing *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N.A.*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952). Thus, Ohio courts have often refrained from intervening in cases involving the discipline of a clergy member. *See Smith v. White*, 2d Dist. Montgomery No. 25622, 2014-Ohio-130; *Sacrificial Missionary Baptist Church v. Parks*, 8th Dist. Cuyahoga No. 71608, 1997 Ohio App. LEXIS 5308 (Nov. 26, 1997); *Early Church of God in Christ, Inc. v. Jackson*, 1st Dist. Hamilton No. C-220115, 2022-Ohio-4034, ¶ 15; *Doe v. Pontifical College Josephinum*, 10th Dist. Franklin No. 16AP-300, 2017-Ohio-1172, ¶ 9; *Turner v. Tri-County Baptist Church of Cincinnati*, 2018-Ohio-4658, 122 N.E.3d 603, ¶ 18 (12th Dist.), citing *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir.1986) (dismissing complaint with breach of contract and defamation claims because the claims "concern[ed] church discipline, faith, and organization, all of which are governed by ecclesiastical rule, custom, and law."). Courts have similarly declined to exercise jurisdiction over disputes relating to the interpretation or compliance with internal church procedures. *Jones v. Wilson*, 8th Dist. Cuyahoga No. 88890, 2007-Ohio-6484, ¶ 26 (concluding that the trial court properly refrained from resolving a dispute as to whether a church

followed a 150-person quorum rule set forth in its constitution because resolution of the dispute would "inextricably require an examination of internal church discipline, which is governed by ecclesiastical rule, custom, and law"); *Turchyn v. Nakonachny*, 157 Ohio App.3d 284, 288, 811 N.E.2d 119 (8th Dist.2004); *Howard v. Covenant Apostolic Church*, 124 Ohio App.3d 24, 29, 705 N.E.2d 385 (1st Dist.1997).

{¶ 62} "Ohio appellate courts have fashioned the ecclesiastical abstention doctrine into a two-part test to determine whether a court has subject-matter jurisdiction over a church dispute." *Harrison* at ¶ 41, citing *Bhatti v. Singh*, 148 Ohio App.3d 386, 2002-Ohio-3348, 773 N.E.2d 605, ¶ 25 (12th Dist.). First, the court must determine whether the church is hierarchical or congregational. *Slavic Full Gospel Church, Inc. v. Vernyuk,* 8th Dist. Cuyahoga No. 97158, 2012-Ohio-3943, ¶ 17. If the church is hierarchical, civil courts generally lack jurisdiction to hear the dispute. *Tibbs* at 42. In a hierarchical system, the congregation is subordinate to a general organization, typically consisting of clerics or tribunals, which controls religious or doctrinal policy and makes decisions for the entire membership. *Shariff v. Rahman*, 152 Ohio App.3d 210, 2003-Ohio-1336, 787 N.E.2d 72, ¶ 12 (8th Dist.).

{¶ 63} In contrast, in a congregational system, the congregation governs itself; it is subservient to no other body. *Tibbs* at 42, citing *State ex rel. Morrow v. Hill*, 51 Ohio St.2d 74, 76, 364 N.E.2d 1156 (1977). If the church is congregational, a civil court has jurisdiction only to determine a narrow issue—whether the proper

church authority made the decision regarding an ecclesiastical dispute. *Id.* The ultimate arbiter of the bylaws is the highest authority within the organization, and the court's role is limited to identifying that authority, not reviewing its decision. *Shariff* at ¶ 15.

{¶ 64} Second, courts determine whether the nature of the dispute is ecclesiastical or secular. *Slavic Full Gospel Church* at ¶ 18. This determination involves review of the complaint and counterclaims to identify whether the controversies in each count involve ecclesiastical or secular issues. *Tibbs* at 43. Ecclesiastical matters include decisions about faith, doctrine, and selection of the clergy as well as matters of church government. *Parks*, 8th Dist. Cuyahoga No. 71608, 1997 Ohio App. LEXIS 5308, *5-6 (Nov. 26, 1997).

{¶ 65} In this case, there is no dispute that the Diocese is a hierarchical system. Nevertheless, this court has clarified that civil courts retain jurisdiction over purely secular issues, whether the church is hierarchical or congregational. *See Parks* at 6-7 ("Purely secular matters, those not involving church doctrine or church policy, however, are not beyond the jurisdiction of a civil court."), citing *Tibbs*, 93 Ohio App. at 42, 637 N.E.2d 397; *Salzgaber v. First Christian Church*, 65 Ohio App.3d 368, 372, 583 N.E.2d 1361 (4th Dist.1989). This is true of hierarchical churches, those churches with an outside governing body, as well as congregational churches that do not have any such outside governing body. Accordingly, we must assess the allegations set forth in Fr. Plishka's complaint and determine whether the nature of Fr. Plishka's abuse-of-process claim involves purely secular issues.

## C. The Abuse-of-Process Claim

{¶ 66} "The tort action termed 'abuse-of-process' has developed for 'cases in which legal procedure has been set in motion in proper form, with probable cause, and even with ultimate success, but nevertheless has been perverted to accomplish an ulterior purpose for which it was not designed.'" *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 68 Ohio St.3d 294, 297, 626 N.E.2d 115 (1994), quoting Keeton, Dobbs, Keeton & Owen, *Prosser and Keeton on the Law of Torts*, Section 121, 897 (5th Ed.1984). To establish a claim for abuse-of-process, a party must prove "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Id.* at paragraph one of the syllabus.

{¶ 67} As previously stated, the sole cause of action set forth in Fr. Plishka's complaint alleged that the defendants "misused" the Diocese's original lawsuit "to "summarily and unilaterally suspend [Fr. Plishka] and harm his credibility and reputation as a Byzantine Priest." (Fr. Plishka's complaint at ¶ 8.) Relevant to this appeal, the complaint further alleged that the Diocese filed the original lawsuit specifically to avoid its own internal church procedures, which would have entitled Fr. Plishka to notice and the opportunity to be heard before an objective body of the Byzantine Catholic church. (*Id.* at ¶ 12.) Fr. Plishka states that

> had the defendants chosen to use these intended procedures, they would have discovered that the property at issue actually belonged to plaintiff, or remained at the Cultural Center. [Fr. Plishka] never would

have been publicly accused of theft. He never would have been suspended.

(*Id.* at ¶ 13.)

{¶ 68} On appeal, the defendants reiterate their position that the trial court lacked jurisdiction to adjudicate the merits of the abuse-of-process claim because it "could not enter judgment on Fr. Plishka's claim without opining on the underlying ecclesiastical discipline." According to the defendants, the abuse-of-process claim is a "thinly veiled" challenge to the propriety of the Diocese's decision to suspend him from the ministry. Alternatively, the defendants argue that even if Fr. Plishka is not directly challenging his suspension, the abuse-of-process claim is "inextricably entangled with ecclesiastical concerns regarding disciplinary procedures." They suggest that various ecclesiastical issues would have to be navigated to determine whether Fr. Plishka's abuse-of-process claim is meritorious, including:

1. Whether canon law required the defendants to provide Fr. Plishka with certain due process before it authorized [the Diocese] to suspend him;

2. Whether canon law authorized the defendants to do an "end-around" their own internal procedures by filing a civil lawsuit to summarily and unilaterally suspend Fr. Plishka; [and]

3. Whether the Diocese had grounds to suspend Fr. Plishka under canon law without first suing him, such that it was irrelevant that the defendants allegedly did an end-around their own internal procedures[.]

{¶ 69} Contrarily, Fr. Plishka argues that his abuse-of-process claim is purely secular and can be resolved without consideration of ecclesiastical issues. Fr. Plishka states that his abuse-of-process claim "did not challenge the propriety of his

suspension in the civil courts nor does he ask the civil courts to reinstate him." Rather, his claim merely "asked the civil courts to adjudicate the propriety of [the defendants'] decision to commandeer the civil courts in order to achieve that which those courts could not order — his suspension and publication of the same." He summarizes his position as follows:

> The complaint — and Fr. Plishka's consistent position throughout this litigation cannot be clearer: This case is about [the defendants'] misuse of civil process for the purpose of effecting an ulterior purpose. * * * Fr. Plishka does not now — and has not ever — asked the trial court or this court to weigh in on the validity of his suspension from ministry. * * * Resolution of that issue belongs solely to the authority of ecclesiastical courts.[5]

{¶ 70} After careful review of the record and the materials attached to the defendants' various motions, we find Fr. Plishka's abuse-of-process claim is inextricably entangled with ecclesiastical concerns. Even accepting Fr. Plishka's contention that his complaint does not directly challenge the propriety of his

---

[5] Fr. Plishka alternatively argues for the first time on appeal that the ecclesiastical abstention doctrine does not deprive the trial court of subject-matter jurisdiction. His argument is premised on the decision rendered in *Winkler v Marist Fathers of Detroit, Inc.*, 500 Mich. 327, 333, 901 N.W.2d 566 (2017) ("[T]he ecclesiastical abstention doctrine informs how civil courts must adjudicate claims involving ecclesiastical questions; it does not deprive those courts of subject-matter jurisdiction over such claims."); *St. Joseph Catholic Orphan Soc. v. Edwards*, 449 S.W.3d 727, 736-737 (Ky.2014) ("We, therefore, conclude that ecclesiastical abstention does not divest Kentucky courts of subject-matter jurisdiction because it does not render our courts unable to hear types of cases, only specific cases pervaded by religious issues."); and *Brazauskas v. Fort Wayne-South Bend Diocese, Inc.*, 796 N.E.2d 286, 290 (Ind.2003) ("A court with general authority to hear matters like employment disputes is not ousted of subject matter or personal jurisdiction because the defendant pleads a religious defense."). After careful consideration, we decline to divert from the controlling precedent of this court. *See Tibbs*, 93 Ohio App.3d at 42-45, 637 N.E.2d 397 (affirming the trial court's judgment granting appellees' motion to dismiss for lack of subject-matter jurisdiction pursuant to Civ.R. 12(B)(1).).

suspension, we find the abuse-of-process claim necessary requires inquiry into ecclesiastical matters, including whether the Diocese's internal procedures permitted it to suspend Fr. Plishka based on the nature of his alleged conduct and the initiation of civil proceedings against him. In this regard, we find the evidence required to establish the second element of the abuse-of-process claim to be instructive.

{¶ 71} It is well settled that to establish the second element of an abuse-of-process claim,

> "a claimant must show that one used process with an 'ulterior motive,' as the gist of [the] offense is found in the manner in which process is used."

*Omran v. Lucas*, 7th Dist. Mahoning No. 21 MA 0031, 2021-Ohio-4592, ¶ 41, quoting *Clermont Environmental Reclamation Co. v. Hancock*, 16 Ohio App.3d 9, 11, 474 N.E.2d 357 (12th Dist.1984). Thus,

> [t]he gravamen of the misconduct for which the liability * * * is imposed is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; *it is the misuse of process*, no matter how properly obtained, for any purpose other than that which it was designed to accomplish.

(Emphasis added.) Restatement of the Law 2d, Torts, Section 682, Comment a.

{¶ 72} As recognized by this court, ""'the ulterior motive contemplated by an abuse-of-process claim generally involves an attempt to gain an advantage outside the proceeding, using the process itself as the threat.""" *Carson v. Carrick*, 8th Dist. Cuyahoga No. 108129, 2019-Ohio-4260, ¶ 15, quoting *Mills v. Westlake*, 2016-Ohio-5836, 70 N.E.3d 1189, ¶ 38 (8th Dist.) quoting *Sivinski v. Kelley*, 8th Dist. Cuyahoga

No. 94296, 2011-Ohio-2145, ¶ 36, ("noting typical ulterior purposes as 'extortion of money, prevention of a conveyance, compelling someone to give up possession of something of value, when these things were not the purpose of the suit [,]'" quoting *Wolfe v. Little*, 2d Dist. Montgomery No. 18718, 2001 Ohio App. LEXIS 1902, 10 (Apr. 27, 2001)). In other words, "[t]he key factor in an abuse-of-process lawsuit 'is whether an *improper purpose* was sought to be achieved by the use of a lawfully brought previous action." (Emphasis added.) *Carson* at ¶ 16, quoting *Yaklevich*, 68 Ohio St.3d at 300, 626 N.E.2d 115.

{¶ 73} "Conversely, abuse-of-process does not occur when a party uses the court to pursue a legal remedy that the court is empowered to give." *Sivinski* at ¶ 37, citing *Ruggerio v. Kavlich*, 8th Dist. Cuyahoga No. 92909, 2010-Ohio-3995; *Havens-Tobias v. Eagle*, 2d Dist. Montgomery No. 19562, 2003-Ohio-1561; *see also Stout v. Columbia Gas of Ohio, Inc.*, 2d Dist. Clark No. 2020-CA-42, 2021-Ohio-609, ¶ 66. Similarly, ""there is no liability [for abuse-of-process] where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions."" *Hershey v. Edelman*, 187 Ohio App.3d 400, 2010-Ohio-1992, 932 N.E.2d 386, ¶ 41 (10th Dist.), quoting *Yaklevich* at 298, quoting Prosser & Keeton, *The Law of Torts*, Section 121, 898 (5th Ed.1984).

{¶ 74} Pursuant to the foregoing caselaw, it is evident that an essential element of an abuse-of-process claim requires the plaintiff to establish that a legal process was misused or improperly used to achieve a result the trial court was not authorized to grant. In other words, a critical component of the tort is the *improper*

use of the legal process. With respect to this issue, the parties have greatly contested one another's interpretation of ecclesiastical text and whether Fr. Plishka's suspension was authorized, and thereby proper, under canon law and the Diocese's internal procedures.

{¶ 75} As previously stated, Fr. Plishka's complaint alleged that the original lawsuit was not filed for its stated purpose and that the Diocese intentionally failed to comply with its own internal procedures before issuing the Suspension Decree. Fr. Plishka expanded upon his position during his deposition, stating that Archbishop Skurla was not permitted to "circumvent the [canonical] process" by citing the original lawsuit as justification for the suspension. (Fr. Plishka depo. at 490.) According to Fr. Plishka's interpretation of canon law, Archbishop Skurla could only effectuate his suspension by initiating the appropriate canonical proceedings. (*Id.*) He explained:

> A priest can never be suspended for being suspected of anything. That's why we have the code of canons that has process associated with it. You can only have a penalty imposed on you if you're found guilty of delict.

(Fr. Plishka depo. at 540.) Thus, Fr. Plishka opined that "the suspension itself was improper" and "not supported by fact and not supported by law." (Fr. Plishka depo. at 509, 527.)

{¶ 76} In contrast, Archbishop Skurla testified that he was permitted to suspend Fr. Plishka from the ministry before conducting a canonical hearing pursuant to the Diocese's interpretation of "Canon 1517." (Archbishop Skurla depo. at 104, 171, 175-176, 179-180, 182-183.) Archbishop Skurla explained that Fr.

Plishka's suspension constituted an "extraordinary decree" that was issued following extensive conversations with canon lawyers regarding their interpretation of canon law and church procedures. (Archbishop Skurla depo. at 174-175; Archbishop Aff. ¶ 33-34.)

{¶ 77} Popp, the current director of the Cultural Center, offered similar sentiments, testifying that the Suspension Decree was proper, stating,

> Because of the removal of ecclesiastical goods, church goods, the archbishop had the ability and the right to give a penalty, which was to suspend him of his priestly ministries.

(Popp depo. at 181.) Finally, Monsignor Easton averred that "it was canonically proper for Archbishop Skurla to suspend appellant using an extrajudicial or administrative suspension decree pursuant to Canon 1517" once appellant failed to return the Diocese's property as requested. (Monsignor Easton Aff. ¶ 22-23.) Monsignor Easton further averred that "as a matter of canon law, the suspension decree issued by Archbishop Skurla to appellant on July 20, 2017, was not dependent upon a civil suit being filed." (Monsignor Easton Aff. ¶ 29.)

{¶ 78} Contrary to the conclusions rendered by the trial court, we find resolution of the parties' competing interpretations of the foregoing ecclesiastical issues is critical to Fr. Plishka's abuse-of-process claim. This case does not present factual circumstances that are analogous to traditional examples of an abuse-of-process. For instance, there is no allegation that the original lawsuit was used to coerce or otherwise compel Fr. Plishka to do something the court was not permitted to order. Rather, it has been alleged that the civil process was improperly used to

effectuate Fr. Plishka's suspension without affording him internal and timely canonical hearings. In our view, such an allegation requires a determination of whether canon law and/or the Diocese's internal procedures did or did not permit the Diocese to suspend Fr. Plishka in the fashion employed in this case. If the suspension was authorized under the applicable canon law and internal procedures of the church, it cannot be said that the civil process was misused or improperly used. Instead, the suspension would merely constitute a permissible consequence envisioned under applicable canon or ecclesiastical laws.

{¶ 79} We further note that the required analysis would inevitably require the trial court to assess the correctness of the defendants' interpretation of canonical text and church policies — an inquiry the trial court is equally prevented from considering. *See Paul v. Watchtower Bible & Tract Soc. of N.Y., Inc.*, 819 F.2d 875, (9th Cir.1987) ("Ecclesiastical abstention thus provides that civil courts may not redetermine the correctness of an interpretation of canonical text or some decision relating to government of the religious polity. Rather, we must accept as a given whatever the entity decides."). Evidence relating to these issues likely would have required testimony from Archbishop Skurla and Monsignor Easton regarding their interpretations of the applicable canon law and the provisions alleged to have justified Fr. Plishka's suspension, i.e., evidence that was properly barred by the trial court pursuant to its Exclusion Order.

{¶ 80} Under the foregoing circumstances, we find the question of whether the defendants misused or improperly used the original lawsuit in this case is not

limited to the interpretation of secular law. Resolving this dispute would require an examination of the disputed canon laws and internal church procedures — matters that civil courts are prohibited from adjudicating. Because the trial court lacked subject-matter jurisdiction to resolve Fr. Plishka's abuse-of-process claim, we find the trial court erred in denying the defendants' motion to dismiss.

{¶ 81} The defendants' sole cross-assignment of error is sustained. Our resolution of the cross-assignment of error renders Fr. Plishka's assigned errors moot. The judgment entered in favor of the Diocese in Case No. CV-18-896359 is not altered by this decision.

{¶ 82} Judgment reversed and remanded.

It is ordered that appellees/cross-appellants recover from appellant/cross-appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

MICHELLE J. SHEEHAN, P.J., and
EMANUELLA D. GROVES, J., CONCUR